## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **FERNANDO ARMENDARIZ, et al.** | |
| *Plaintiffs*, | |
| v. | **Case 1:22-cv-00536** |
| **SIG SAUER, INC.** | |
| *Defendant.* | |

## DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. CIV. P. 12(B)(3) AND TO SEVER AND TRANSFER CLAIMS OF EACH PLAINTIFF

Defendant Sig Sauer, Inc. ("Sig Sauer") respectfully requests that this Court (1) sever the claims of each of the named injured Plaintiffs, creating twenty (20) separate actions[1], and (2) transfer each of those separate actions to the United States District Court for the district in which the individual Plaintiff's alleged accident occurred.

## PRELIMINARY STATEMENT

This consolidated action involves twenty separate Plaintiffs, none of whom are from New Hampshire, who were allegedly injured in accidents involving a P320 model pistols that occurred under different handling circumstances and resulted in different injuries. Plaintiffs allege that their pistols discharged when they "did not intend to fire the gun." Plaintiffs claim that each of their P320 pistols is defective because it did not include an external safety, such as a manual thumb safety or a tabbed trigger safety, which, they say, provide protection against an inadvertent trigger pull. Sig Sauer provides a manual thumb safety as an optional feature on the P320 pistol for those

---

[1] There are 33 total plaintiffs named in the Complaint, 13 of whom the Complaint alleges are spouses asserting claims for loss of consortium who reside at the same address as an injured plaintiff.

customers who choose that additional level of trigger security. But Plaintiffs argue that, irrespective of customer preference resulting from their individual philosophy of use, Sig Sauer should mandate that one or more of these external safety features be included on all P320 pistols sold.

Plaintiffs obtained the incident pistols under different circumstances, with the majority of the incident pistols issued to Plaintiffs by their employer rather than being purchased by Plaintiff. This raises numerous questions about the various agencies' analyses of potential pistols and what features were appropriate for their assigned firearms. In many cases, law enforcement agencies affirmatively choose to purchase firearms without manual safeties because, in their view, the drawbacks of these features outweigh any benefits. For example, in issuing a solicitation for the purchase of new firearms for its personnel, the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") expressly required that pistols submitted for consideration "[s]hall not have a thumb, finger or grip-actuated safety device." One quarter of the Plaintiffs – 5 out of 20 – were using ICE-issued P320 pistols that were intentionally purchased *without* a manual safety. Discovery will show that other law enforcement agencies made similar affirmative choices to purchase P320 pistols without manual safeties consistent with their training requirements and overall philosophy of use.

Plaintiffs' accidents occurred under disparate handling circumstances, including, for example, when the pistol was being inserted into or removed from a holster, when the holstered pistol was being removed from the Plaintiff's person, when the Plaintiff was engaged in a training exercise and shooting the pistol, or while the pistol was being transported unsecured in a bag. None of the Plaintiffs claim their P320 pistol fired without the trigger being depressed.

These factual distinctions regarding handling at the time of the accident and circumstances of acquisition are central to Plaintiffs' claims, require individualized search for and examination of the pertinent facts, and render Plaintiffs' claims unsuitable for resolution in a consolidated manner. Moreover, Plaintiffs' claims raise issues that must be analyzed differently under various states' laws. As such, Plaintiffs' highly individualized claims should be severed and separately litigated in their home forums—that is, the districts where the core events giving rise to the claims occurred, where the courts most familiar with the applicable law can adjudicate the claims, and where the parties can secure the live trial testimony of critical fact witnesses, including training personnel, accident scene witnesses, first responders, treating physicians and those who made decisions regarding the purchase or approved use of the incident pistol.

Because Plaintiffs' claims arise out of unrelated and individualized facts and circumstances, the substantive laws governing these individual claims will likely be those of Plaintiffs' home jurisdictions, thereby encompassing up to thirteen distinct product liability regimes with standards that differ from the laws of New Hampshire. Severance is warranted because a single trial of these diverse claims would undoubtedly result in substantial jury confusion, inefficiency, fundamental unfairness to the parties and unwarranted burden on this Court.  Once severed, the individual Plaintiffs should be transferred to their home venues, pursuant to 28 U.S.C. § 1404.  Based on the face of their complaint, the core events giving rise to their claims all occurred in their home districts, and all the critical non-party witnesses are also located in their home districts, and not in New Hampshire.

## FACTUAL BACKGROUND

Sig Sauer manufactures firearms for sale to the military, law enforcement agencies at the federal, state and municipal levels, and civilians. In 2014, Sig Sauer introduced the P320 model

pistol, a striker-fired pistol with a modular design that allows users to modify the grip size and caliber of their pistol without purchasing a new firearm. Since that date, the P320 pistol has become one of the most popular handguns on the market, with over 2.5 million units sold to governmental and law enforcement agencies, the military, and civilians.

In 2017, the United States Army selected the M17 / M18 – a variant of the P320 pistol – as its new service pistol. Since then, multiple branches of the military have moved to the M17 / M18 as their designated sidearms. Based on the military's philosophy of use for its sidearms, the Army required that any pistol submitted for consideration must "have an external, manually operated safety control (switch/button/lever) which can be operated with the firing hand."[2] Thus, the P320 variant submitted to, and ultimately selected by, the Army contained a manual thumb safety. This external safety feature was also made available for inclusion on P320 pistols sold to law enforcement agencies and civilians at their option, including the Plaintiffs in this action.

I.   **The Subject P320 Pistols**

The P320 pistols involved in Plaintiffs' incidents were purchased under a variety of circumstances and necessarily involve varying considerations predicated on individualized assessments of training considerations and overall philosophies of use. The majority of the pistols – 11 of 20 – were purchased by law enforcement agencies and issued to Plaintiffs in connection with their employment.[3] Each of these agencies would have conducted its own analysis in determining the appropriate firearms for use by its officers, including specifically whether the inclusion of a manual safety was appropriate for their officers.

---

[2] AR-PD-177, Purchase Description – Modular Handgun, December 17, 2015, attached as **Exhibit 1**, at § 3.4.4(c).
[3] Compl. ¶¶ 150, 174, 200, 209, 237, 247, 255, 282, 299, 307.

For example, in 2016, ICE issued a solicitation for new duty pistols to be used by "non-uniformed ICE Law Enforcement employees to perform official duties and [to be] used during a variety of training scenarios" which were required to reliably function in conditions "often encountered by ICE armed employees throughout the world."[4] Among the explicit requirements in the solicitation was that the pistol "**[s]hall not have** a thumb, finger or grip-actuated safety device." *Id.* at § C4.9. Thus, ICE specifically determined that its officers' firearms should not have an external manual thumb safety based on the conditions in which the firearms would be used. Five of the twenty Plaintiffs in this action are ICE agents whose pistols were issued to them after being purchased pursuant to ICE's requirements. Other law enforcement agencies would have underwent similar analysis of the needs of their officers and affirmatively decided to purchase pistols without manual thumb safeties or other external safeties. These varying considerations are central to Plaintiffs' claims regarding the configuration of the P320 pistols at issue.

Even where the Plaintiffs purchased the P320 pistols themselves, the option to include various external safeties was available to each Plaintiff. To the extent a particular feature was desired by a particular Plaintiff and not available on the P320 pistol – such as an external grip safety – they could have selected a different model pistol from a different manufacturer. Each of these Plaintiffs had a choice of what features were included on his or her pistol when making their purchase decision, and each of them chose to purchase a P320 pistol without an additional external safety feature.

---

[4] ICE Solicitation Number HSCEMS-16-R-00003, attached as **Exhibit 2**, at C1.

II.    **Plaintiffs' Claims**

Plaintiffs are twenty individuals – and, in some cases, their spouses – who reside across the following thirteen states: Texas, Georgia, Connecticut, Tennessee, Oklahoma, Virginia, Louisiana, Florida, Massachusetts, Wisconsin, Minnesota, Washington, and New Jersey. *See Compl.* ¶¶ 7-39. Each of the Plaintiffs allege they purchased or were issued a P320 model pistol. *See id.* ¶¶ 149-313. Additionally, each of the plaintiffs further allege they were injured when the P320 pistol discharged unexpectedly and without them *intending* to fire the pistol.[5]  *Id.*   The accidents occurred under a variety of handling circumstances, including when the pistol was being inserted into or removed from a holster (*e.g.,* Compl. ¶¶ 152, 160), when the holstered pistol was being removed from the Plaintiff's person (*e.g.,* Compl. ¶ 168), when the Plaintiff was engaged in a training exercise and shooting the pistol (*e.g.*, Compl. ¶¶ 175, 256), or while the pistol was being carried unsecured in a bag (*e.g.,* Compl. ¶ 202), among other circumstances. None of the Plaintiffs claim their P320 pistol fired without the trigger being depressed inadvertently, a claim which has been raised previously but never replicated. In fact, all of the Plaintiffs appear to recognize that something inadvertently pulled the trigger while it was being handled.

Plaintiffs have filed this consolidated action in this District encompassing each of the twenty Plaintiff's individual claims.  Yet, not a single Plaintiff resides in New Hampshire, nor are there any facts alleged in the Complaint indicating that any of the alleged accidents giving rise to Plaintiffs' injuries occurred in New Hampshire. *See id.* Each of the Plaintiffs brings separate claims for negligence and strict liability claiming their injuries were caused by a defect in the subject

---

[5] Several of the plaintiff did not sustain physical injuries as a result of being impacted by the bullet, but claim they are suffering from mental or emotional issues related to the incident. *See, e.g.*, Compl. ¶¶ 204, 286, 303.

P320 pistol.  Additionally, each of the non-New Hampshire resident plaintiffs improperly bring a claim under the New Hampshire Consumer Protection Act, RSA 358-A.[6]

## ARGUMENT

### I.   Plaintiffs' Actions Should be Severed

Federal Rule of Civil Procedure 20(a)(1) provides that "[p]ersons may join in one action as plaintiffs if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. Proc. 20(a)(1). If both elements of Rule 20(a)(1) are not satisfied, "a court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by the severance." *Cruz v. Bristol-Myers Squibb Co.*, PR, 699 F.3d 563, 569 (1st Cir. 2012) (internal quotation marks and citation omitted) (upholding district court's severing of two plaintiffs where each lost his job under different circumstances and asserted distinct legal claims against defendants).  The determination as to whether parties have been misjoined, and severance is appropriate, lies within the sound discretion of the district court. *See Beaulieu v. Concord Grp. Ins. Co.*, 208 F.R.D. 478, 479 (D.N.H. 2002) (granting motion to sever and finding preconditions of permissive joinder were not met because claims did not arise out of same transaction or occurrence).

A court's determination as to whether it should sever claims under Rule 21 or order separate trials under Rule 42 rests on the same considerations and both are within the broad discretion of the district court. *Acevedo-Garcia v. Vera-Monroig*, 204 F.R.D. 26, 30 (D.P.R.

---

[6] Sig Sauer has filed a motion to dismiss each plaintiff's individual New Hampshire Consumer Protection Act claim because none of the plaintiffs alleges he or she received any misrepresentation in New Hampshire as required to sustain a claim under the Act. *See* Sig Sauer, Inc.'s Motion to Dismiss Plaintiffs' Claims for Violations of the New Hampshire Consumer Protection Act, RSA 358-A.

2001), *aff'd sub nom. Acevedo-Garcia v. Monroig*, 351 F.3d 547 (1st Cir. 2003). Considerations include: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present common questions of law and facts; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if the trials were severed and heard by separate juries; and (5) whether different witnesses and documentary proof are required for the separate claims. *Id.* "Severance requires the presence of only one of these conditions." *Wai Feng Trading Co. v. Quick Fitting, Inc.*, No. CA 13-033 S, 2014 WL 4199174, at *8 (D.R.I. Aug. 22, 2014). Further, the interest of a fair and impartial trial to all litigants is a "paramount consideration" and weighs more heavily in the determination than considerations of economy of time, money and convenience of witnesses. *Acevedo-Garcia*, 204 F.R.D. at 30.

Even where parties are properly joined under Rule 20(a)(1), the potential for confusion or prejudice resulting from joinder may nevertheless warrant severance of their claims under Rule 21. *See* Fed. R. Civ. Proc. 21; *Abraham v. Allen Mello Dodge, Inc.*, No. 11-CV-329-JD, 2011 WL 4625686, at *3 (D.N.H. Oct. 3, 2011); *Wai Feng Trading Co. v. Quick Fitting, Inc.*, No. CA 13-033 S, 2014 WL 4199174, at *8 (D.R.I. Aug. 22, 2014); *Delce v. Amtrak & Resco Holdings, Inc.*, 180 F.R.D. 316, 319 (E.D. Tex. 1998); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (in wrongful termination case, finding strong risk of prejudice and danger of jury confusion from having ten plaintiffs testify in one trial). Rule 21 explicitly provides that "*[a]ny* claim against a party may be severed and proceeded with separately." *United States v. O'Neil*, 709 F.2d 361, 369 (5th Cir. 1983) (emphasis in original). Severance is especially favored where the risk of jury confusion is significant due to different legal and factual issues presented by different claims. *See Wai Feng Trading Co*, 2014 WL 4199174, at *8; *Henderson v. AT & T Corp.*, 918 F.

Supp. 1059, 1064 (S.D. Tex. 1996) ("The confusion that would be engendered by a single trial is simply too great, and would substantially threaten AT&T's right to a fair trial.").

Further, it is well established that "where claims are more properly tried in another forum, severance is the judicial tool of choice." *Delce*, 180 F.R.D. at 319-20 (collecting cases); *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968) (finding that facts justified ordering severance "solely for the purpose of facilitating transfer"); *Henderson*, 918 F. Supp. at 1064 ("The power to sever properly joined claims to facilitate transfer is well-recognized.").  Although the robust body of case law supporting severing of cases to facilitate transfer is primarily from sister jurisdictions, the First Circuit has expressly adopted the "prevailing rule" that a finding of misjoinder is not a prerequisite to severing parties or claims under Rule 21 "where there are sufficient other reasons for ordering a severance." *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 560 n. 5 (1st Cir. 2003); *see also Abraham*, 2011 WL 4625686, at *3 (even if permissive joinder requirements are met, courts may sever based on "other considerations such as avoiding prejudice and delay, assuring judicial economy, or safeguarding fundamental fairness").

Here, severance is warranted both because of the substantial risk of prejudice and confusion that would result from trying the Plaintiffs' claims jointly and to facilitate transfer of the individual claims to Plaintiffs' respective home districts.

### a. Plaintiffs' product liability claims arise from distinct occurrences.

All twenty Plaintiffs allege that they were injured by different P320 pistols acquired under different circumstances, at different times, in different states, under different handling circumstances, resulting in different injuries. *See* Compl. at pp. 24-47 [Doc. No. 1]. These differences make Plaintiffs' claims improper for joinder. *See In re Accutane Products Liability Litigation MDL No. 1626*, 2012 WL 4513339, *1 (M.D.Fla.2012) ("The law is clear that large

multi-plaintiff complaints are improper under Fed.R.Civ.P. 20(a). Many federal courts hold that product liability cases are generally inappropriate for multi-plaintiff joinder because such cases involve highly individualized facts and [l]iability, causation, and damages will ... be different with each individual plaintiff.") (internal quotation marks and citations omitted); *Allstate Prop. & Cas. Ins. Co. v. Omega Flex, Inc.*, No. 1:12-CV-00442-WTL, 2013 WL 786764, at *2 (S.D. Ind. Mar. 1, 2013) ("While each fire allegedly involved defective or improperly installed TracPipe, it cannot be disputed that the fires were separate occurrences in separate locations," a fact which weighed in favor of severing claims.). Distinct issues among the purchase decision, handling of the pistol, and circumstances of the discharge make consolidation particularly inappropriate here.

While each Plaintiff's claim arises from an alleged unintended discharge of a P320 pistol, they otherwise arise from unique alleged facts. By way of example, Plaintiff Catherine Chargulaf alleges that she was injured on December 8, 2020, when her ICE-issued P320 pistol discharged in its holster while completing a training exercise in Tennessee, whereas Plaintiff William Clegg alleges he was injured on November 7, 2022 in Oklahoma when his personal P320 holstered pistol discharged when he tossed a wooden paddle onto the chair where the gun was sitting. *See* Compl. ¶¶ 173-189. Moreover, the incident P320 pistols were purchased under various different circumstances, most often by someone other than the Plaintiff. These purchase decisions involve considerations of the distinct philosophy of use by the individual purchaser or issuing agency. In many circumstances those differing philosophies of use expressly dictate what features the specific pistol involved should or should not have.  As discussed above, ICE made just such a considered decision that its officers would be best served if their issued P320 pistols did **not include** any external manual thumb safety.

The unique training and use conditions and specific consumer choices are a key issue to the resolution of each individual Plaintiff's claims, and consolidating those issues under a single case carries a significant risk of jury confusion and unfair prejudice to Sig Sauer. Because these individualized factors are central to the examination of each Plaintiff's claims, this factor weighs in favor or severing the claims.

### b.  Plaintiffs' claims present distinct questions of fact and law.

Beyond the individualized facts which underlie Plaintiffs' claims, it is likely that the individual laws of thirteen jurisdictions will apply to those claims.  Plaintiffs each assert one cause of action based on New Hampshire law: violation of the New Hampshire Consumer Protection Act.  However, as discussed in Sig Sauer's concurrently-filed motion to dismiss, those claims fail as a matter of law because there are no allegations that any of the Plaintiffs *received* any alleged misrepresentations about the P320 pistol in New Hampshire as is required under the statute.  If the Plaintiffs were to attempt to proceed under a consumer protection cause of action they would have to do so under thirteen disparate states' statutes.

Plaintiffs' remaining claims sound in negligence and strict products liability.  These common law claims must be resolved in accordance with each Plaintiff's home state's laws.  In the First Circuit, a federal court sitting in diversity over state-law claims applies the conflicts laws of the forum state – here, New Hampshire. *See Smith v. Morbark Indus., Inc.*, 733 F. Supp. 484, 487 (D.N.H. 1990).  Under New Hampshire law, "conflict-of-law questions are resolved by weighing five choice-influencing considerations: (1) predictability of results; (2) maintenance of reasonable orderliness and good relationship among the States in our federal system; (3) simplification of the judicial task; (4) advancement by the court of its own State's governmental interests rather than those of other States; and (5) the court's preference for what it regards as the

sounder rule of law." *Barrett v. Ambient Pressure Diving, Ltd.*, No. CIV. 06-CV-240-SM, 2008 WL 4934021, at *2 (D.N.H. Nov. 17, 2008).  Applying this analysis to Plaintiffs' tort claims, the substantive laws of the states in which Plaintiffs' accidents occurred should govern their individual claims. *See e.g.*, *Ferren v. Gen. Motors. Corp.*, 628 A.2d 265, 267-69 (N.H. 1993) (instructing the U.S. District Court for the District of New Hampshire that Kansas law—not New Hampshire law—governed the plaintiff's claims relating to lead poisoning because the plaintiff was exposed to the lead dust that caused his injury while working in Kansas, not New Hampshire).

Were Plaintiffs' claims to remain joined, thirteen different states' substantive laws, in addition to procedural laws of New Hampshire, would apply to the claims presented at trial.  As illustrated by the attached chart, these laws vary significantly. *See* State-by-State Comparison (**Ex. X**). Their differences will make litigating the disparate claims joined into a consolidated action by Plaintiffs unworkable. *Id.*

Each of the thirteen different states at issue requires the application of different standards of proof in strict liability design defect claims.. *Id.* In fact, no two states use the same test (or combination of tests) to evaluate whether a product is defective or unreasonably dangerous. *Id.* Oklahoma, for example, has adopted Section 402A of the Restatement (Second) of Torts and mandates the use of a consumer expectations test to evaluate whether a product was unreasonably dangerous as a result of a defective design. *See Kirkland v. Gen. Motors. Corp.*, 521 P.2d 1353, 1362 (Okla. 1974). Louisiana, on the other hand, has enacted the Louisiana Product Liability Act, which provides the exclusive remedy for all personal injury claims involving defective products. La. Rev. Stat. Ann. § 9:2800.52. Further unlike Oklahoma, Louisiana's Product Liability Act mandates that a statutory risk-utility test be applied to evaluate whether a product was unreasonably dangerous as a result of a defective design as opposed to Oklahoma's consumer

expectations test. La. Rev. Stat. Ann. § 9:2800.56. Minnesota has adopted yet another standard that fuses concepts of negligence into strict liability claims and requires the use of a "reasonable care" balancing test. *See Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 622 (Minn. 1984); *Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 356 (Minn. Ct. App. 1991). Minnesota's "reasonable care" test involves a balancing of the likelihood of harm, and the gravity of the harm if it occurs, against the burden on the manufacturer of preventing the harm. *See Bilotta*, 346 N.W.2d at 622.

It will be impossible for a jury to understand, differentiate, and apply the thirteen conflicting standards applicable to the strict product liability claims at issue. Instructing the jury on such closely related—and yet distinctly different—standards of proof will inevitably result in significant confusion in the jury deliberation room. Jurors will be saddled with an infeasible task if they are required to remember the details of how each accidental discharge occurred, keep track of which state each plaintiff is from, and identify and appropriately apply the standard of proof required by the relevant jurisdiction to each Plaintiff's claim. The simple and appropriate solution is to sever the claims and return each case to the jurisdictions within which each accidental discharge occurred. Plaintiffs will still have their day in court and the inevitable confusion that would result from trying twenty factually and legally distinct cases at once will be eliminated.

Whether or not proof of a safer and feasible alternative design is required in order to prevail on each individual claim will also generate significant juror confusion. At least six of the states at issue require a plaintiff to prove that a safer and feasible alternative design exists, while seven of them do not.[7] This will require jurors to evaluate in certain cases whether a design identified as supposedly "safer and feasible" by the plaintiffs was, indeed, safer and feasible. Jurors may

---

[7] The states that require proof of a safer and feasible alternative design are: Connecticut, Louisiana, Massachusetts, Texas Virginia, Washington, and Wisconsin. *See* State-by-State Comparison (Ex. X). The states that do not are: Florida, Georgia, Minnesota, New Jersey, Oklahoma, and Tennessee. *Id.*

determine that the alternative design proposed in certain cases was not safer, was not feasible, or would not have prevented the injury in question. In that case, the same jurors may find against the plaintiffs whose state law requires proof of an alternative design, but they will be required to set that evidence aside and continue deliberating as to the plaintiffs whose state law does not require such proof.

Instructing a jury on the laws of thirteen states and directing jurors to apply numerous distinct, though in some cases overlapping, legal standards to the same causes of action asserted by twenty different plaintiffs is not only a recipe ripe for confusion, but also counter to the interests of judicial economy. *See Acevedo-Garcia*, 351 F.3d at 558 ("the circumstances of this case compel the conclusion that the division of plaintiffs was a legitimate and feasible means of efficiently conducting this unwieldy litigation").

### c.  Severance is proper to avoid confusion and prejudice.

This is a case that would undoubtedly result in prejudice to Sig Sauer, and potentially to all parties, if Plaintiffs' claims were tried together. It is well-established that severance is appropriate where a joint trial is likely to result in prejudice to a party stemming from jury confusion. *See Acevedo-Garcia v. Vera-Monroig,* 204 F.R.D. 26, 30 (D.P.R. 2001), *aff'd,* 351 F.3d 547 (1st Cir. 2003) ("having fewer Plaintiffs testify in each trial would provide the jury with the ability to understand and remember the evidence and witness testimony, and thereby enable them to better appreciate the weight thereof when rendering their verdict."); *Sitts v. Dairy Farmers of Am., Inc.*, No. 2:16-CV-287, 2020 WL 2092719, at *4 (D. Vt. May 1, 2020) ("The risk that a jury will be confused and struggle to parse the facts in a multi-plaintiff case is undeniable and increases with the number of individual parties."); *Wai Feng Trading Co. v. Quick Fitting, Inc.*, No. CA 13-033 S, 2014 WL 4199174, at *8 (D.R.I. Aug. 22, 2014) ("When the jury is likely to be confused,

or there is risk of potential prejudice to one party by trying two claims together, the court should sever the cases."); *Cruz v. Bristol Myers Squibb Co. P.R.*, 264 F.R.D. 22, 25 (D.P.R. 2010), *aff'd,* 699 F.3d 563 (1st Cir. 2012) ("allowing a case that poses a potential for jury confusion and conflicts of interest among plaintiffs (i.e. the potential that one plaintiff's claim is stronger or weaker than the claim of another plaintiff) would disservice plaintiffs as much as defendants"); *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 265-66 (D. Conn. 2012) ("The court agrees with the defendants that individualized evidence as to the daily responsibilities of thirty-nine plaintiffs could easily confuse a jury even with the clearest of jury instructions").

A joint trial here would impose upon the jury the insurmountable task of parsing out highly individualized factual evidence applicable to Plaintiffs' claims *in addition to* applying the governing product liability regimes of more than ten different states during a month's long proceeding.   Moreover, there is a risk that the jury will improperly generalize the circumstances applicable to one or more Plaintiffs to *all* Plaintiffs as a result of confusion or bias.  This is clearly a case where severance is warranted to protect "the court's paramount concern" of "ensuring a properly instructed jury can perform its critical function." *Sitts*, 2020 WL 2092719 at *4.

   **d.  Allowing the claims to proceed jointly is contrary to the interests of judicial economy.**

The interests of judicial economy are not served by joinder unless there is substantial overlap in discovery, depositions, and witnesses and documentary proof at trial. *See Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 171 (S.D.N.Y. 2009).  Where "outstanding discovery is not shared among plaintiffs, and separate trials would rely on substantially different evidence, this factor tips in favor of severance." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 265 (D. Conn. 2012).  Moreover, a single trial "is not the *de facto* approach to promoting judicial economy." *Sitts v. Dairy Farmers of Am., Inc.*, No. 2:16-CV-287, 2020 WL 2092719, at *3 (D.

Vt. May 1, 2020); *N. Jersey Media Grp. Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 117 (S.D.N.Y. 2015) (multiple shorter, more manageable trials may be more efficient than one long, combined trial requiring the court to constantly caution the jury to consider proof on an individual basis).  Here, while certain common issues likely exist with respect to Plaintiffs' allegations of design defect, different discovery, witnesses, and documentary proof would nevertheless be required for each Plaintiffs' separate claims.  Further, given the sheer number of claims, factual issues, and different state laws likely to be involved, a joint trial would undoubtedly be lengthy and unwieldy, requiring constant judicial instruction to try to mitigate jury confusion.

Finally, any potential prejudice or inconvenience that Plaintiffs may claim would result from having to litigate these claims in separate actions would be diminished by a track record of ongoing coordinated discovery efforts with Plaintiffs' counsel across these cases.  *See, e.g., Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000).  This factor therefore also weighs in favor of severance.

## II.   Plaintiffs' Actions Should Be Transferred to the Districts Where their Accidents Occurred

Severance of Plaintiffs' claims is also necessary to facilitate transfer, which is proper under 28 U.S.C. § 1404(a).  Under 28 U.S.C. § 1404(a), a case may be transferred to any other district court where it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice."  Section 1404(a) places discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness. *Butler v. Thompson/Ctr. Arms Co.*, No. 01-106-JD, 2001 WL 1570949, at *2 (D.N.H. Oct. 31, 2001).  A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of case-specific factors. *Id.* These factors include: (1) the convenience of the parties, (2) the convenience of the witnesses, (3) the relative ease of access to sources of proof, (4) the

availability of process to compel attendance of unwilling witnesses, (5) the cost of obtaining willing witnesses, and (6) trying the case most expeditiously and inexpensively. *Id.*

There can be no dispute that Plaintiffs' actions "might have been brought" in the districts in which their accidents took place.  Under 28 U.S. Code § 1391(b)(2), "a civil action may be brought in… a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  The districts in which Plaintiffs' alleged injuries took place clearly satisfies this standard; thus, transfer of these actions to those courts is proper under § 1404(a).  Further, as discussed below, the considerations of convenience and fairness to be balanced by the court weigh strongly in favor of transfer.

### a. Transfer serves the convenience of the parties.

A district court has "broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir.2006). While a plaintiff's chosen forum is typically entitled to some deference, that presumption does not apply equally when the jurisdiction chosen is not plaintiff's home forum. *See Kleinerman v. Luxtron Corp.*, 107 F. Supp. 2d 122, 125 (D. Mass. 2000) ("When a plaintiff chooses his home forum, the choice more likely represents considerations of convenience rather than vexation or harassment to the defendant, thus elevating the hurdle the defendant is required to clear to warrant transfer."); *Olympia Grp., Inc. v. Cooper Indus., Inc.*, No. 00 CIV. 7367 (MBM), 2001 WL 506219, at *3 (S.D.N.Y. May 14, 2001) ("The plaintiff's choice is entitled to less deference when the plaintiff does not reside in the chosen forum.").  Here, not a single one of the 33 Plaintiffs is asserting claims in his or her home forum, nor can there be any argument that Plaintiffs would be inconvenienced by transferring their actions to their home forums, where they live, work, and presumably, to the extent required, receive

medical care.  To the extent Plaintiffs might argue that the convenience of their lawyers would be served by maintaining the actions together in the District of New Hampshire, courts are clear that "the convenience of counsel is not relevant to the decision whether to transfer. *See, e.g., Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 29 (S.D.N.Y. 2016).  Individual Plaintiffs will not be unduly burdened by litigating in their home forums and will still reap the benefits of coordinated discovery, as discussed above.  Indeed, Plaintiffs' counsel is already litigating other claims against Sig Sauer in numerous jurisdictions around the country.

**b. The convenience of witnesses and the availability of process to compel attendance of unwilling witnesses weighs strongly in favor of transfer.**

Transferring Plaintiffs' claims to Plaintiffs' home districts preserves the parties' ability to secure live trial testimony from these key third-party witnesses.  Most if not all non-party witnesses in these cases are outside of the subpoena powers of the Court.  "The availability of process to compel the testimony of important witnesses is an important consideration in transfer motions." *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 28 (S.D.N.Y. 2016) (quotation marks and citation omitted); *McGraw–Hill Companies Inc. v. Jones*, No. 12–cv–7085 (AJN), 2014 WL 988607, at *7 (S.D.N.Y. Mar. 12, 2014) (convenience of non-party witnesses weighed more heavily than convenience of party witnesses in transfer analysis).  Under the Federal Rules of Civil Procedure, a district court may command testimony or production of documents "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c).  As discussed above, key non-party witnesses in these cases include Plaintiffs' law enforcement employing agencies, co-workers and other eyewitnesses, family members, treating physicians and other healthcare providers.  These non-party witnesses presumably reside in or adjacent to Plaintiffs' home districts and thus can most reliably be compelled to appear as witnesses within their home districts.  Given that New Hampshire is not the state of residence of a single Plaintiff,

nor did any of the accidents at issue occur in New Hampshire, maintaining the action in this forum means the Court will be unable to compel the live attendance of any of these crucial non-party witnesses, which would severely prejudice Sig Sauer.  The preference for live trial testimony, particularly for witnesses whose testimony has significant bearing on the disposition of the relevant claims, is well recognized by courts in the First Circuit. *See, e.g., Scholtens v. Gyrus Acmi, Inc., No. 4:18-CV-12187-TSH, 2019 WL 2528377*, at *5 (D. Mass. May 10, 2019), report and recommendation adopted, No. 4:18-CV-12187, 2019 WL 2565664 (D. Mass. June 13, 2019).

Notably, a witness's willingness to travel does not cure this issue. "Even if witnesses were willing to testify, the long-distance travel required could impede trial in this district and would impose substantial expense on witnesses or the parties calling them." *In re E. Dist. Repetitive Stress Injury Litig.*, 850 F. Supp. 188, 194 (E.D.N.Y. 1994). Nor would Sig Sauer likely be able to obtain the voluntary attendance of these witnesses, given the travel and inconvenience involved. In addition, Sig Sauer's communications with Plaintiffs' doctors would be constrained by rules concerning *ex parte* communications between plaintiffs and their healthcare providers, making it even more improbable that Plaintiffs' doctors would voluntarily appear at Sig Sauer's request. Further, to the extent non-party witnesses were willing to appear, facilitating the travel of those witnesses to New Hampshire would still be far more costly and inconvenient than if the cases were litigated in Plaintiffs' home states.  Thus, the cost of obtaining willing witnesses is also a factor that weighs in favor of transfer.

By contrast, Sig Sauer has the power to compel its employee-witnesses to travel to provide testimony as necessary, as it has consistently done in the other unintended discharge cases venued throughout the country. *See Scholtens*, 2019 WL 2528377, at *5 ("Employees of a defendant party are non-factors in the convenience-to-witnesses analysis, since the employer has leverage by virtue

of the employment relationship to require employees to appear at proceedings.").  In sum, while transferring the actions will significantly increase the convenience of non-party witnesses without compromising Plaintiffs' access to party witnesses, maintaining the action in New Hampshire will obstruct Sig Sauer's ability to obtain key witnesses and result in substantial prejudice.[8]

### c.   The interests of justice and efficiency militate in favor of transfer.

The most appropriate venue for each Plaintiff's claims is Plaintiff's home district because that is the site of the core events giving rise to the claim. *See, e.g., Copley v. Wyeth, Inc.*, Civ. No. 09–722, 2009 WL 2160640, at *4 (E.D. Pa. July 17, 2009); *In re Consol. Parlodel Litig.*, 22 F. Supp. 2d 320, 326 (D.N.J. 1998).   "The location of operative facts is a primary factor in determining a § 1404(a) motion to transfer." *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 30 (S.D.N.Y. 2016) (quotation marks and citation omitted); *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 268 (D. Conn. 2012) (quotation marks and citation omitted) ("The locus of operative facts is an important factor to be considered in deciding where a case should be tried."). "To determine the locus of operative facts, a court must look to the site of the events from which the claim arises." *Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional*, No. 08–cv–8106 (PGG), 2009 WL 2252116, at *6 (S.D.N.Y. July 28, 2009) (quotation marks and citation omitted). Not every occurrence relevant to the case need have occurred in the transferee forum to make that forum the locus of operative facts." *Costello*, 888 F. Supp. 2d at 268-69.

It is a basic premise that a plaintiff's accident involving a product, and alleged injury therefrom, are at the center of product liability claims. *See, e.g., McGrew v. Howmedica Osteonics*

---

[8] With respect to the ease of access to documents and sources of proof, courts have found, and Sig Sauer agrees, that this consideration is functionally irrelevant "in the modern era of faxing, scanning, and emailing documents." *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 30 (S.D.N.Y. 2016) (quotation marks and citation omitted); *Costello*, 888 F. Supp. 2d at 268.  Documentary evidence in these cases will be located both in Defendants' and Plaintiffs' home forums, but the location where such documents originate and/or are maintained has little impact on the ability to share files across state lines.

*Corp.*, No. 14-cv-430-SMY-PMF, 2015 WL 159367, at *4 (S.D. Ill. Jan. 13, 2015) ("Based on the representations that Plaintiffs were implanted with Cervicore and received subsequent treatment in their respective and/or adjoining districts, the Court finds it appropriate to transfer the Plaintiffs' claims to the respective districts in which Plaintiffs reside.").   In addition, a plaintiff's residence is a material factor in determining the appropriate locus of suit. Venue in a plaintiff's home district is favored. *See, e.g., Kleinerman*, 107 F. Supp. 2d at 125.   Here, New Hampshire is not home to any Plaintiff, and the state does not have a significant connection to the material events underlying Plaintiffs' individual claims. *See* Compl. The complaint includes no assertion that Plaintiffs purchased their P320 pistols in New Hampshire, received any information about the P320 pistol in New Hampshire, that their alleged accidents or injuries took place in New Hampshire, or that they received any treatment for such injuries outside of their home districts. *See id.*; *see also, e.g., McGrew*, 2015 WL 159367, at *4 (concluding that transfer to plaintiffs' home districts was appropriate when plaintiffs received the product at issue in their home districts and had subsequent treatment in those districts); *In re Consol. Parlodel Litig.*, 22 F. Supp. 2d at 326 ("Although Parlodel was designed and manufactured in New Jersey, and NPC made various decisions in New Jersey, Parlodel was marketed and consumed by Plaintiffs in their home districts.").   Thus, a Plaintiff's home district is the most rational venue because, unlike New Hampshire, a Plaintiff's home district is the site of the core events giving rise to Plaintiff's claims, despite the choice of this forum. *See, e.g., McCraw v. GlaxoSmithKline*, Civ. No. 12-2119, 2014 WL 211343, at *5 (E.D. Pa. Jan. 17, 2014) ("Though the development of Paxil is alleged to have occurred within the Eastern District of Pennsylvania, the 'operative facts' (e.g., where ingestion and injury occurred) are those which are alleged to have occurred within the Southern District of Texas."); *Boksenbaum v. Abbott Labs.*, Nos. 09–CV–5425 (ENV)(JMA), 10–CV–4247 (ENV)(JMA), 2012 WL 6061360,

at *1 (E.D.N.Y. Dec. 6, 2012) (overriding plaintiff's choice of forum in favor of plaintiff's venue of residence because that is where "most of the critical events" occurred, including plaintiffs' prescription of the medication in question and receipt of medical treatment); *Hutson v. A.H. Robins Co.*, 846 F. Supp. 14, 16 (S.D.N.Y. 1994) (overriding plaintiff's choice of forum in favor of plaintiff's venue of residence at the time of her medical treatment, where discovery would be "centered").

Furthermore, Sig Sauer's residence in the District of New Hampshire does not outweigh the more significant relationship between Plaintiffs' claims and their home districts. Courts have repeatedly ruled in products liability suits that the home venue of the plaintiff — not that of the defendant manufacturer — is the appropriate locus of suit. *See In re Consolidated Parlodel Litigation*, 22 F. Supp. 2d 320, 326-27 (D.N.J. 1998) (Although the product at issue was designed and manufactured in the defendant's home state, the product "was marketed and consumed by Plaintiffs in their home districts," and their claims thus "arose in Plaintiffs' home districts."); *McLaughlin v. GlaxoSmithKline, L.L.C.*, C.A. No. 12-3272, 2012 WL 4932016, at *3 (E.D. Pa. Oct. 17, 2012) (transferring suit to venue of plaintiff's residence even though product at issue was designed and manufactured by defendant in different venue); *Copley v. Wyeth, Inc.*, Civ. No. 09–722, 2009 WL 2160640, at *4 (E.D. Pa. July 17, 2009) (transferring suit to venue of plaintiff's residence even though product at issue was designed and manufactured by defendant in different venue); *In re Aredia & Zometa Prods. Liab. Litig.*, No. 3:06-MD-1760, 2008 WL 686213, at *3-4 (M.D. Tenn. Mar. 6, 2008) (transferring suit to venue of plaintiff's residence and away from pharmaceutical company's venue of residence); *Locklear v. Mylan Inc.*, No. 1:10CV164, 2011 WL 3296635, at *6 (N.D. W. Va. Aug. 1, 2011) (transferring suit to venue of plaintiff's residence even though the design, marketing, and testing of the product at issue occurred in a different venue).

22

In addition, trying this case as one action in this Court would be costly and unmanageable. Expenses related to the appearance of numerous witnesses from thirteen different states would be prohibitive, and, as discussed above, the sheer volume of evidence pertaining to the separate Plaintiffs and the necessity to instruct the jury on the distinct product liability laws of numerous jurisdictions would be counter to the goals of efficiency, expediency, and fairness.

### d. Public interest supports transfer.

Maintaining venue in this district would jeopardize (1) the interest in having each Plaintiff's claims resolved by a court familiar with the applicable law, i.e., the districts where the alleged events giving rise to the claims occurred; and (2) the Plaintiffs' home districts' interests in locally adjudicating the claims raised there. "District courts are presumed to be more familiar with the law of the state in which they sit." *Costello*, 888 F. Supp. 2d at 269; *Galley v. Kreutzig*, 15-cv-00047-JDL, 2015 WL 2349373, at *7 (D. Me. May 15, 2015) ("A court's familiarity with the applicable law has ... been recognized in this circuit as an appropriate factor in deciding a motion to transfer."); *Scholtens*, 2019 WL 2528377, at *8. As discussed above, Plaintiffs bring common law claims most likely subject to resolution under their home state's laws, and these laws are different in every state at issue. *See* Ex. X. Because the district court in each Plaintiff's home district would be most familiar with such governing law, transfer is warranted. In addition, Plaintiffs' home forums will have a superior local interest in adjudicating these disputes, which all involve firearms purchased, used, and which allegedly caused injury in their respective jurisdictions. This interest is not diminished by the fact that the guns were designed and manufactured in New Hampshire. *See Scholtens*, 2019 WL 2528377, at *8 ("That interest is not diminished if, as Plaintiff contends, a Massachusetts company contributed to the design and

marketing of the product. Indeed, if true, Michigan has an interest in resolving any liability of the Massachusetts company for a product used in Michigan.").

Plaintiffs' counsel has, in essence, collected the claims of unrelated, out-of-state Plaintiffs into a single action resembling a *de facto*, smaller scale multidistrict litigation, but one that fundamentally abuses the MDL structure by attempting to litigate numerous non-resident Plaintiffs' claims together, in one forum, for all purposes.  Rather, the MDL was intended to consolidate civil actions involving common questions of fact pending in different districts solely for coordinated pretrial proceedings, as indicated by its organic statute, which provides:

> Each action so transferred ***shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred*** unless it shall have been previously terminated: Provided, however, That the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded.

28 U.S. Code § 1407(a) (emphasis added); *see also In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372, 1375-76 (J.P.M.L. 2003).  Thus, where Plaintiffs' counsel has boasted about the size of this lawsuit and declared the action "unprecedented,"[9] it is clear that the uniqueness of the case stems only from the fact that the joinder of claims under these circumstances finds no support in the law and is contrary to public interest.

## **CONCLUSION**

For the reasons stated above, Sig Sauer respectfully requests that the Court sever the cases into separate actions for each of the twenty Plaintiffs.  Sig Sauer further requests that the Court

---

[9] *See* Press Release dated Dec. 1, 2022, https://www.smbb.com/news-article/20-gunshot-victims-wounded-by-their-defective-sig-sauer-p320-pistols-file-an-unprecedented-lawsuit-against-the-gunmaker/.

transfer these separate actions to the United States District Court for the district in which the

individual Plaintiff's alleged accident occurred.

Dated: February 2, 2023                    */s/ Mark V. Franco*
                                            Mark V. Franco, Esq.
                                            *Attorney for Defendant*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
mfranco@dwmlaw.com

Dated: February 2, 2023                    */s/ Demetrio F. Aspiras*
                                            Demetrio F. Aspiras, Esq.
                                            *Attorney for Defendant*

**DRUMMOND WOODSUM**
670 N. Commercial Street, Suite 207
Manchester, NH 03101
Tel: (603) 792-7414
daspiras@dwmlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Mark V. Franco, Esq., hereby certify that on this 2nd day of February, 2023, I filed the

foregoing with the Clerk of Court for the United States District Court for the District of New

Hampshire using the CM/ECF system which will send electronic notification of same to all

parties and counsel on record.


Dated: February 2, 2023                        /s/ Mark V. Franco
                                                          Mark V. Franco, Esq.
                                                          *Attorney for Defendant*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
mfranco@dwmlaw.com