## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**FERNANDO ARMENDARIZ AND MIRIAM TREBINO, H/W**
100 West Tree Farm Drive
Lytel, Texas 78052

*And*

**MATTHEW BREEDON AND LINDSEY BROOKE MIXON, H/W**
6809 Sandnettles Dr.
Savannah, Georgia 31410

*And*

**ZACHARY BROWN**
314 Sharon Turnpike
Goshen, Connecticut 06756

*And*

**CATHERINE CHARGUALAF AND JUAN SAN NICOLAS CHARGUALAF, W/H**
7816 Haydenberry Cove
Bellevue, Tennessee 37221

*And*

**WILLIAM CLEGG AND JADA BRAY, H/W**
9065 South Iron Stob Road
Atoka, Oklahoma 74525

*And*

**DIONICIO DELGADO AND DIANA DELGADO, H/W**
23235 Richmond Turnpike
Ruther Glen, Virginia 22546

*And*

NO. 1:22-cv-00536

JURY TRIAL DEMANDED

**MARY DOFFENY AND JOSEPH DOFFENY, W/H**
199 Dunleith Drive
Destrehan, Louisiana 70047

*And*

**DAVID DUFF**
13345 Antonio Way
Dade City, Florida 33525

*And*

**JUAN DURAN**
401 Rayburn Street
Leviland, Texas 79336

*And*

**KYLA ELLIS AND CLAYTON ELLIS, W/H**
281 South Orleans Road
Orleans, Massachusetts 02653

*And*

**JAMES GARTH JR.**
107 Oak Grove Lane, Apt 2005
Eatonton, Georgia 31024

*And*

**JOSEPH HALASE AND LYNN MARIE HALASE, H/W**
7905 White Tail Drive
Mt. Pleasant, Wisconsin 53406

*And*

**AMY HENDEL**
18612 Irvine Trail
Lakeville, Minnesota 55044

*And*

**NATHAN HENYAN AND AMBER HENYAN, H/W**
105 North 89th Avenue
Yakima, Washington 98908

*And*

**DWIGHT JACKSON AND MICHAELA-KELLY JACKSON, H/W**
6028 Golfview Crossing
Locust Grove, Georgia 30248

*And*

**ADAM MARITATO AND LAURA LYNN MARITATO H/W**
W210N16530 Woodshire Court
Jackson, Wisconsin 53037

*And*

**MICHAEL PARKER**
3290 72nd Street
Saint Petersburg, Florida 33702

*And*

**ROBERT PARKS AND MICHELLE PARKS, H/W**
126 South Tower Drive
Port Washington, Wisconsin 53074

*And*

**JAMES SCOPPA AND LEAH MICHELLE SCOPPA H/W**
37 Gallant Fox Lane
Egg Harbor Township, New Jersey 08234

*And*

**JERRY WYCHE**
621 Totty Way
Lake Alfred, Florida 33850

*Plaintiffs,*

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, New Hampshire 03801

*Defendant.*

## FIRST AMENDED COMPLAINT – CIVIL ACTION

## PARTIES

1.      The Plaintiffs in this action are a group of highly trained and experienced firearms users whose lives were upended by a dangerously defective pistol: the Sig Sauer P320.

2.      Upon the information discovered through research and document production, the Sig Sauer P320 is the most dangerous pistol for its users sold in the United States market.

3.      The Plaintiffs in this action are federal law enforcement agents, police officers, combat veterans, detectives, firearms instructors, and civilians who have dedicated significant portions of their lives to the safe use of weapons.

4.      The Plaintiffs in this action trusted Sig Sauer to live up to its reputation as a designer and manufacturer of safe and reliable handguns.

5.      The Plaintiffs in this action trusted Sig Sauer to live up to its promise that the P320 "would not fire unless you want it to."

6.      The Plaintiffs in this action were lied to and let down by Sig Sauer, falling victim to the dangerously designed and manufactured P320.

7.      Plaintiff, Fernando Armendariz ("Plaintiff" or "Armendariz") is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

8.      Plaintiff, Miriam Trebino ("Plaintiff" or "Trebino") is the wife of Armendariz, is a citizen, and resident of the State of Texas, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

9.      Plaintiff, Matthew Breedon ("Plaintiff" or "Breedon"), is an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address.

10.     Plaintiff, Lindsey Brooke Mixon ("Plaintiff" or "Mixon") is the wife of Breedon, is an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

11.     Plaintiff, Zachary Brown ("Plaintiff" or "Brown"), is an adult individual, citizen, and resident of the State of Connecticut, residing at the above-captioned address.

12.     Plaintiff, Catherine Chargualaf ("Plaintiff" or "Chargualaf"), is an adult individual, citizen, and resident of the State of Tennessee, residing at the above-captioned address.

13.     Plaintiff, Juan San Nicholas Chargualaf ("Plaintiff" or "Juan Chargualaf") is the husband of Chargualaf, is an adult individual, citizen, and resident of the State of Tennessee, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

14.     Plaintiff, William Clegg ("Plaintiff" or "Clegg") is an adult individual, citizen, and resident of the State of Oklahoma, residing at the above-captioned address.

15.     Plaintiff, Jada Bray ("Plaintiff" or "Bray") is the wife of Clegg, an adult individual, citizen, and resident of the State of Oklahoma, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

16.     Plaintiff, Dionicio Delgado ("Plaintiff" or "Delgado"), is an adult individual, citizen, and resident of the Commonwealth of Virginia, residing at the above-captioned address.

17.     Plaintiff, Diana Delgado ("Plaintiff" or "Diana Delgado") is the wife of Delgado, is an adult individual, citizen, and resident of the Commonwealth of Virginia, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

18.     Plaintiff, Mary Doffeny ("Plaintiff" or "Doffeny"), is an adult individual, citizen, and resident of the State of Louisiana, residing at the above-captioned address.

19.     Plaintiff, Joseph Doffeny ("Plaintiff" or "Joseph Doffeny"), is the husband of Doffeny, an adult individual, citizen, and resident of the State of Louisiana, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

20.     Plaintiff, David Duff ("Plaintiff" or "Duff"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

21.     Plaintiff, Juan Duran ("Plaintiff" or "Duran"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

22.     Plaintiff, Kyla Ellis ("Plaintiff" or "Ellis"), is an adult individual, citizen, and resident of the Commonwealth of Massachusetts, residing at the above-captioned address.

23.     Plaintiff, Clayton Ellis ("Plaintiff" or "Clayton Ellis"), is the husband of Ellis, is an adult individual, citizen, and resident of the Commonwealth of Massachusetts, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

24.     Plaintiff, James Garth Jr. ("Plaintiff" or "Garth"), is an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address.

25.     Plaintiff, Joseph Halase ("Plaintiff" or "Halase"), is an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address.

26.     Plaintiff, Lynn Marie Halase ("Plaintiff" or "Lynn Marie Halase"), is an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address and makes claims of loss of consortium as described herein.

27.     Plaintiff, Amy Hendel ("Plaintiff" or "Hendel"), is an adult individual, citizen, and resident of the State of Minnesota, residing at the above-captioned address.

28.     Plaintiff, Nathan Henyan ("Plaintiff" or "Henyan"), is an adult individual, citizen, and resident of the State of Washington, residing at the above-captioned address.

29.     Plaintiff, Amber Henyan ("Plaintiff" or "Amber Henyan"), is the wife of Henyan, an adult individual, citizen, and resident of the State of Washington, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

30.     Plaintiff, Dwight Jackson ("Plaintiff" or "Jackson"), is an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address.

31.     Plaintiff, Michaela-Kelly Jackson ("Plaintiff" or "Michaela Jackson"), is the wife of Jackson, an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

32.     Plaintiff, Adam Maritato ("Plaintiff" or "Maritato"), is an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address.

33.     Plaintiff, Laura Lynn Maritato ("Plaintiff" or "Laura Maritato"), is the wife of Maritato, an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

34.     Plaintiff, Michael Parker ("Plaintiff" or "Parker"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

35.     Plaintiff, Robert Parks ("Plaintiff" or "Parks"), is an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address.

36.     Plaintiff, Michelle Parks ("Plaintiff" or "Michelle Parks"), is the wife of Parks, is an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

37.     Plaintiff, James Scoppa ("Plaintiff" or "Scoppa"), is an adult individual, citizen, and resident of the State of New Jersey, residing at the above captioned address.

38.     Plaintiff, Leah Michelle Scoppa ("Plaintiff" or "Leah Scoppa"), is the wife of Scoppa, is an adult individual, citizen, and resident of the State of New Jersey, residing at the above captioned address, and makes claims of loss of consortium as described herein.

39.     Plaintiff, Jerry Wyche ("Plaintiff" or "Wyche"), is an adult individual, citizen, and resident of the State of Florida, residing at the above captioned address.

40.     Defendant, Sig Sauer, Inc. ("Sig Sauer" or "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

**JURISDICTION AND VENUE**

41.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is perfect diversity of citizenship between the parties.  The defendant is a resident of the state of New Hampshire.  Each plaintiff resides in a state other than New Hampshire.  The court may exercise personal jurisdiction over the defendant because it is a resident to New Hampshire.

42.     Venue is proper because a substantial part of the acts and omissions giving rise to this action occurred in New Hampshire.

## GENERAL ALLEGATIONS

43.     Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

44.     Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

45.     The Sig Sauer P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

46.     There have been over 100 incidents (and likely multiples more) of the Sig Sauer unintentionally discharging when the user believed they did not pull the trigger, many of which have caused severe injury to the users and/or bystanders.

47.     The vast majority of these users are law enforcement officers, former military personnel, and/or trained and certified gun owners.

48.     At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

49.     This action seeks actual, compensatory, and enhanced compensatory damages, and equitable relief, relating to Defendant, Sig Sauer Inc.'s (hereinafter "Defendant" or "Sig Sauer"), negligence, defective design, and unfair and deceptive marketing practices regarding a firearm.

50.     Specifically, this matter involves a striker-fired pistol known as the "P320" that has fired without the trigger being pulled or deliberately actuated by the user, on numerous civilians and law enforcement agents across the nation.

51.     Prior to the incidents detailed below in this Complaint, Sig Sauer received multiple complaints and notifications of P320 pistols firing when the trigger was either not pulled, or not deliberately actuated by the user.

52.     In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:

## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

53.     Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many, many times.

54.     Defendant, Sig Sauer, had knowledge long before the sales of the P320s used by Plaintiffs that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker, a hinged trigger, and/or a grip safety.

55.     For many years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

56.     Years before the incident occurred, through and including the date of Plaintiffs incidents, which span from February 15, 2020 to October 3, 2022, Sig Sauer expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every

necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320

won't fire unless you want it to":



57.     In additional marketing material, under the heading "Striker Safety," Sig Sauer

further states: the striker safety "[p]revents the striker from being released unless the trigger is

pulled."

58.     At the same time, Sig Sauer contradictorily stated in the original owner's manual

for the P320, which warns on page 25, that the weapon could fire if dropped without the trigger

being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

59.     It is standard operating procedure for many U.S. law enforcement agencies, local

police departments, and the military, at a commander's discretion, as well as customary for many

private owners, to carry pistols with a chambered round.

60.     Sig Sauer advertises that users can carry the P320 with a round chambered by

annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

61.     The "+ 1" represents a chambered round.

62.     Sig Sauer was aware of the latter fact at the time it designed and manufactured all its pistols, including the P320. The P320 is the first striker-fired pistol[1] it has ever manufactured.

63.     Sig Sauer assembled the P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

64.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, Sig Sauer's prototype P320s exhibited nearly 200 malfunctions during Army testing. The Army demanded that Sig Sauer fix all problems associated with the prototype.

65.     The Unites States Army only agreed to the purchase of the P320 after Sig Sauer committed to designing an external manual safety for every military gun sold.

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol. It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear. In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.



66.     Of the nearly 20 models of non-military P320s, only 1 model offers a manual external safety as an "option."

67.     Sig Sauer's custom-design program allows for hundreds of thousands of different configurations of the P320, but does not allow users to add any type of external safety.

68.     An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the P320.

69.     A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

70.     Upon information and belief, every striker-fired pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

71.     Upon information and belief, Sig Sauer manufactures the only striker-fired pistols on the market that are not equipped with any form of external manual safety.

72.     Upon information and belief, every single-action pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

73.     Upon information and belief, Sig Sauer manufactures the only single-action pistols on the market that are not equipped with any form of external manual safety.

74.     Sometime after January 2017, when a Connecticut law enforcement agent was shot by a P320 that fell to the ground from less than three feet, Sig Sauer removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

75.     Defendant, Sig Sauer had never before represented that mere "vibration" could cause the weapon to discharge.

76.     Upon information and belief, no other firearms manufacturer has ever made such a representation.

77.     Sig Sauer acknowledges in its own manuals that vibrations can cause its safety mechanisms to fail to work as designed.

78.     Since the P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



79.     Despite their representations, Sig Sauer never made a tabbed trigger safety available as an option for the P320.[2]

80.     In fact, Sig Sauer's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

81.     When Sig Sauer shipped P320s to dealers for sale to civilian consumers, Sig Sauer knew or should have known that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and that un-commanded discharges could occur in the ordinary course of using the weapon.

82.     Before Plaintiffs purchased their pistols, Sig Sauer was aware of other, prior un-commanded discharges of the P320 platform, and other Sig Sauer pistols, many of which pre-dated their purchases.

83.     In 2015, a Pennsylvania State Trooper and firearms instructor killed another trooper with his Sig Sauer pistol when it discharged without a trigger pull while conducting safety training.

84.     In 2016, a tactical response training instructor near Sacramento dropped his Sig Sauer, firing a bullet into a student's truck.

85.     In the period between 2012 and 2015, the New York City Police Department reported 10 un-commanded discharges involving Sig Sauer weapons.

86.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan Police Officer's vehicle when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body-worn camera.

---

[2] A tabbed-trigger safety is a small tab within the trigger which must be depressed in order for the entire trigger to be depressed; thus preventing incidental discharges.

87.     In 2016, the Surprise, Arizona Police Department complained to Sig Sauer of two separate incidents of P320s firing without trigger pulls.

88.     In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

89.     In November 2016, a P320 fired un-commanded on an Officer in Holmes Beach Florida, striking him in his leg.

90.     In 2017, a Sheriff's Deputy in Michigan's Sig Sauer pistol discharged without a trigger pull, striking a schoolteacher in the neck.

91.     On January 5, 2017, a P320 shot a Stamford, Connecticut SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

92.     On February 28, 2017, a P320 discharged without a trigger pull while in use by the University of Cincinnati Police Department.

93.     On June 14, 2017, a P320 discharged without a trigger pull in Wilsonville, Oregon.

94.     On June 20, 2017, a P320 discharged without a trigger pull while in use by the Howell Township, New Jersey Police Department.

95.     In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leadership, Sheriff David Chapman that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[3]

---

[3]     As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

96.     On July 28, 2017, a P320 discharged without a trigger pull in Tarrant County, Texas.

97.     On August 4, 2017, the Stamford SWAT team member sued Sig Sauer in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

98.     Four days later, Sig Sauer's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

99.     This statement was false, in view of Sig Sauer's knowledge that Officer Sherperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

100.    On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standard for safety."

101.    This statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

102.    No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

103.    Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to mark existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, an improved sear to prevent un-commanded discharges.

17

104.     On August 9, 2017, the Police Chief of Morrow, Georgia issued and emergency order removing the P320 from service.

105.     In October 2017, a P320 discharged without a trigger pull in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

106.     On November 12, 2017, a P320 discharged without a trigger pull in Dallas County, Texas.

107.     On February 2, 2018, Tyler Herman of McCloud, Oklahoma was removing a holster containing his P320 from his belt. While in the process of removing the holster, and without him touching the trigger, Herman's P320 discharged, striking Herman and causing catastrophic injuries.

108.     On February 7, 2018, Loudoun County, Virginia Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

109.     Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

110.     In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

111.    In June 2018, a Williams County, Ohio Officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

112.    In May 2018, a Rancho Cucamonga, California Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

113.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

114.    In October 2018, retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

115.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused serve tunneling wounds to this right leg.

116.    On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square.

117.    The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a Sig Sauer certified armorer[4] on the P320.

---

[4] According to Sig Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.Sig Sauersaueracademy.com/course/armorer-certification

118.     On July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts Police Department hitting him in his leg and causing substantial injuries to his leg.

119.     In August 2019, a Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video, and the officer was returned to duty the next day.

120.     The transit authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

121.     On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

122.     On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts Police Department, was shot by his P320 without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

123.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

20

124.     On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

125.     The holster was a Safariland level three retention holster with a hood securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

126.     On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts Police Department, as he was in the process of putting his duty belt on.

127.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

128.     On February 27, 2020, Tampa Police Department Reserve Office Howard Northrop was severely and permanently injured when his service-issued P320 discharged without a trigger pull, while inside his service-issued holster.

129.     Northrop was struck in the left leg by a 9mm hollow-point bullet, which mushroomed and caused massive internal damage.

130.     On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski, of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

131.     Slatowski's P320 fired while in its holster, and the casing did not eject.

132.     Slatowski was severely wounded and has not been able to return to duty since the accident as of the date of this filing.

133.    On January 23, 2021, civilian Timothy Davis was severely injured when his Sig Sauer P320 X-Carry discharged in its holster without a trigger pull.

134.    On June 2, 2021, Troy, New York Police Officer Michael Colwell suffered permanent injuries when his P320 discharged in his holster during a training exercise while his hands were not touching the gun.

135.    On February 7, 2022, Honesdale, Pennsylvania Police Officer Donald Thatcher's P320 discharged from its holster while he was exiting his car.

136.    Officer Thatcher's incident was captured on video, which clearly shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

137.    Following this incident, the Honesdale, Pennsylvania Police Department pulled all P320s out of service and sued Sig Sauer for a refund of the firearms.

138.    On March 28, 2022, Houston, Texas Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

139.    Sergeant Reyes's incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were not near his holster at the time the P320 discharged.

140.    On September 10, 2022, a Milwaukee Police Officer's holstered P320 discharged while the officer was attempting to detain a suspect.

141.    Following this incident, the third in as many years involving a Milwaukee Police Officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

142.    In response to the incidents of Milwaukee Police Officers being injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022 that the

Milwaukee Police Department would replace every single P320 in its arsenal with one of Sig Sauer's competitor pistols.

143.    Between 2015-2022, there have been at least *nine* incidents where an Oklahoma Highway Patrol Officer had a P320 discharge when the officer did not pull the trigger.

144.    Internal documents from Immigration Customs Enforcement provide that unintended discharges skyrocketed within the agency once it switched its primary weapon from a Glock to the P320.

145.    Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

146.    To date, Sig Sauer has never issued a mandatory recall of the P320 for repairs; though it has done so in the past for other of its products with far lesser sales.

147.    In an interview in 2013, Sig Sauer's former Chief Financial Officer, Timothy Scullin, just before the P320 was brought to market in 2014, noted that Sig Sauer's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that Sig Sauer's growth has outpaced the firearms' industry's growth by "two or three times."

148.    When asked what some of his biggest professional challenges he has faced in his career, he stated:

> At Sig Sauer, to grow this fast, people get really challenged.  When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous of stress on the people in the system. But we've got people that have risen to the challenge.

149.    At all material times, the geographic location where the P320 was designed, manufactured, and placed into the stream of commerce was Sig Sauer's principal place of business in New Hampshire.

150.     At all material times, the geographic location of the actions and conduct Sig Sauer decided upon, initiated, and undertook as described in this Complaint was Sig Sauer's principal place of business in New Hampshire.

151.     At all material times, the geographic location of the marketing, communications and/or misrepresentations Sig Sauer decided upon, designed, created, initiated, engaged in and/or disseminated as described in this Complaint was Sig Sauer's principal place of business in New Hampshire.

152.     At all materials times, Sig Sauer's principal place of business in New Hampshire was the geographic location of Sig Sauer's unfair and/or deceptive acts and/or practices in trade and commerce as described in this Complaint.

## PLAINTIFFS' INCIDENTS

### Fernando Armendariz

153.     Prior to April 1, 2021, Fernando Armendariz had undergone extensive firearms training while serving in the United States Immigration and Customs Enforcement Agency ("ICE").

154.     Prior to April 1, 2021, Armendariz was issued a P320 by ICE.

155.     On April 1, 2021, Armendariz was participating in an annual inventory and removed his P320 to review its serial number.

156.     On that date, Armendariz's pistol suddenly and unexpectedly discharged while he was re-holstering it.

157.     Armendariz never touched the P320's trigger and did not intend to fire the gun.

158.     The bullet struck Armendariz in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

159.     While the full extent of the physical damage to Armendariz's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

160.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Armendariz was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Armendariz has in the past and is reasonably likely to require medicines, medical care and treatment.  Armendariz has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Armendariz has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Armendariz has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Armendariz's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Armendariz, who has received substantial and ongoing treatments and medicines.

**Matthew Breedon**

161.     Prior to April 4, 2022 Matthew Breedon had undergone extensive firearms training in his personal capacity as a gun owner; including training with his police department's SWAT team while working as a prosecutor.

162.     Prior to April 4, 2022, purchased a P320 for his personal use.

163.     On April 4, 2022 Breedon had his P320 in its holster.

164.     On that date, Breedon's pistol suddenly and unexpectedly discharged while he was attempting to remove it from its holster.

165.     Breedon never touched the P320's trigger and did not intend to fire the gun.

166.     The bullet struck Breedon in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

167.     While the full extent of the physical damage to Breedon's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

168.     Breedon has been deprived of vocational opportunities as a result of this incident.

169.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Breedon was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Breedon has in the past and is reasonably likely to require medicines, medical care and treatment.  Breedon has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Breedon has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Breedon has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Breedon's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Breedon, who has received substantial and ongoing treatments and medicines.

**Zachary Brown**

170.     Prior to January 15, 2022, Zachary Brown had undergone extensive firearms training in his personal capacity as a gun owner.

171.    On January 15, 2022, Brown was removing his still-holstered P320 from his pants.

172.    On that date, Brown's still-holstered pistol suddenly and unexpectedly discharged while he was removing it from his pants.

173.    Brown never touched the P320's trigger and did not intend to fire the gun.

174.    The bullet struck Brown in his right leg, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

175.    While the full extent of the physical damage to Brown's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

176.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Brown was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Brown has in the past and is reasonably likely to require medicines, medical care and treatment.  Brown has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Brown has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Brown has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Brown's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Brown, who has received substantial and ongoing treatments and medicines.

**Catherine Chargualaf**

177.    Prior to December 8, 2020, Catherine Chargualaf had undergone extensive firearms training as an ICE agent.

178.    Prior to December 8, 2020, Chargualaf was issued a P320 by ICE.

179.    On December 8, 2020, Chargualaf was completing a training exercise with a P320 in Mt. Juliet, Tennessee.

180.    On that date, Chargualaf's P320 suddenly and unexpectedly discharged while in its holster.

181.    Chargualaf never touched the P320's trigger and did not intend to fire the gun.

182.    The bullet struck Chargualaf in her right hip, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

183.    While the full extent of the physical damage to Chargualaf's hip is not yet known, she has had and it is likely that she will have trouble running, sitting, or standing as she had before the incident, and will likely never be able to return to her pre-incident form as a result of diminished physical capacity.

184.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Chargualaf was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Chargualaf has in the past and is reasonably likely to require medicines, medical care and treatment.  Chargualaf has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment.  Chargualaf has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Chargualaf has in the past and may in the future continue

to be disabled from performing her usual duties, occupations, and avocations, all to Chargualaf's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Chargualaf, who has received substantial and ongoing treatments and medicines.

**William Clegg**

185.     Prior to November 7, 2022, William Clegg had undergone extensive firearms training in his personal capacity as a gun owner.

186.     In August 2022, William Clegg purchased a P320 from House of Guns in Boswell, Oklahoma.

187.     On November 7, 2022, Clegg placed his holstered P320 on a chair.

188.     On that date, Clegg lightly tossed a small wooden paddle onto the chair, where it incidentally made contact with the holstered P320.

189.     When the wooden paddle made contact with the holstered P320, the gun discharged.

190.     Clegg never touched the P320's trigger and did not intend to fire the gun.

191.     The bullet struck Clegg in the front of his right thigh and then his left thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

192.     While the full extent of the physical damage to Clegg's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

193.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Clegg was forced to suffer

serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Clegg has in the past and is reasonably likely to require medicines, medical care and treatment.  Clegg has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Clegg has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Clegg has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Clegg's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Clegg, who has received substantial and ongoing treatments and medicines.

**Dionicio Delgado**

194.     Prior to February 12, 2022, Dionicio Delgado had undergone extensive firearms training while serving in the United States Navy.

195.     Delgado served as a Navy Small Arms Instructor; training other servicemembers on the safe use of firearms.

196.     Prior to February 12, 2022, Delgado purchased a P320 for his personal use.

197.     On February 12, 2022, Delgado had his P320 in its holster.

198.     On that date, Delgado's P320 suddenly and unexpectedly discharged while still in its holster.

199.     Delgado never touched the P320's trigger and did not intend to fire the gun.

200.     The bullet struck Delgado in his right leg, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

201.     While the full extent of the physical damage to Delgado's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before

the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

202.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Delgado was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Delgado has in the past and is reasonably likely to require medicines, medical care and treatment.  Delgado has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Delgado has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Delgado has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Delgado's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Delgado, who has received substantial and ongoing treatments and medicines.

**Mary Doffeny**

203.     Prior to December 5, 2021, Mary Doffeny had undergone extensive firearms training while serving in the United States Immigration and Customs Enforcement Agency.

204.     Prior to December 5, 2021, Doffeny was issued a P320 by ICE.

205.     On December 5, 2021, Doffeny was at Rose Casino in St. Rose, Louisiana.

206.     On that date, Doffeny's pistol suddenly and unexpectedly discharged while in a dedicated firearm pocket within her purse.

207.     Doffeny never touched the P320's trigger and did not intend to fire the gun.

208.     The bullet struck Doffeny's seat, causing Doffeny to suffer significant post traumatic stress disorder, depression, and anxiety.

31

209.     Doffeny's incident was caught on video, which clearly shows that she did not pull the trigger.

210.     While the full extent of the mental damage to Doffeny is not yet known, she has had and it is likely that she will have trouble functioning as she had before the incident, and will likely never be able to return to her pre-incident form as a result of diminished emotional capacity.

211.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Doffeny was forced to suffer serious and disabling emotional distress, the full extent of which has yet to be determined. Doffeny has in the past and is reasonably likely to require medicines, medical care and treatment. Doffeny has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Doffeny has in the past and may in the future continue to suffer agonizing emotional anguish. Doffeny has in the past and may in the future continue to be disabled from performing her usual duties, occupations, and avocations, all to Doffeny's great loss and detriment. The incident has resulted in substantial trauma to Doffeny, who has received substantial and ongoing treatments and medicines.

**<u>David Duff</u>**

212.     Prior to his February 15, 2020 incident, Duff had undergone extensive firearms training in his career as a Pasco County Sheriff's Deputy in Florida.

213.     Prior to February 15, 2020, Duff was issued his P320 by the Pasco County Sheriff's Office.

214.     On that date, Duff had his holstered weapon on his duty belt.

215.     On that date, Duff's holstered P320 suddenly and unexpectedly discharged when as he was putting on his duty belt.

216.     At the time of discharge, Duff's hands were not on the P320 or its holster.

217.     Duff's weapon failed to cycle and the spent shell casing was removed from the chamber by crime scene technicians.

218.     Duff never touched the P320's trigger and did not intend to fire the gun.

219.     The bullet struck Duff in his left knee, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

220.     While the full extent of the physical damage to Duff's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

221.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Duff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Duff has in the past and is reasonably likely to require medicines, medical care and treatment.  Duff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Duff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Duff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Duff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Duff, who has received substantial and ongoing treatments and medicines.

**Juan Duran**

222.     Prior to February 26, 2022, Duran had undergone extensive firearms training in his personal capacity as a gun owner.

223.     Prior to February 26, 2022, Duran purchased a P320 for his personal use.

224.     On that date, Duran placed his holster on his belt.

225.     On that date, Duran's pistol suddenly and unexpectedly discharged as he stepped forward with his right leg.

226.     Duran's bullet casing failed to fully eject and became stuck in the slide/ejection port (a "stovepipe jam").

227.     Duran never touched the P320's trigger and did not intend to fire the gun.

228.     The bullet struck Duran in his right thigh, shattered his bone, and exited his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

229.     While the full extent of the physical damage to Duran's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

230.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Duran was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Duran has in the past and is reasonably likely to require medicines, medical care and treatment.  Duran has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Duran has in the past

and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Duran has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Duran's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Duran, who has received substantial and ongoing treatments and medicines.

**Kyla Ellis**

231.     Prior to June 15, 2021, Ellis had undergone extensive firearms training by hunting throughout her lifetime.

232.     Prior to June 15, 2021, Ellis purchased a P320 for her personal use.

233.     On June 15, 2021, Ellis was transferring her holstered pistol from her right hand to her left hand.

234.     On that date, Ellis's pistol suddenly and unexpectedly discharged while in its holster.

235.     Ellis never touched the P320's trigger and did not intend to fire the gun.

236.     The bullet struck and traveled through Ellis's left wrist, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

237.     The bullet narrowly missed Ellis's husband, who was sitting next to her in the car.

238.     While the full extent of the physical damage to Ellis's wrist is not yet known, she has had and it is likely that she will have gripping, grasping, and holding as she had before the incident, and will likely never be able to return to her pre-incident form as a result of diminished physical capacity.

239.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Ellis was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Ellis has in the past and is reasonably likely to require medicines, medical care and treatment.  Ellis has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Ellis has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Ellis has in the past and may in the future continue to be disabled from performing her usual duties, occupations, and avocations, all to Ellis' great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Ellis, who has received substantial and ongoing treatments and medicines.

**James Garth Jr.**

240.     Prior to August 18, 2021, Garth had undergone extensive firearms training while serving as a sheriff's deputy in Richmond County, Georgia.

241.     Prior to August 18, 2021, Garth was issued a P320 by Richmond County Sheriff's Office.

242.     On August 18, 2021, Garth put on a duty belt, which has a P320-specific Safariland holster on the right hip.

243.     On that date, Garth put the P320 in the holster.

244.     On that date, while Garth was putting the gun in the holster, it suddenly discharged while the web of his hand was on the back of the gun.

245.     Garth never touched the P320's trigger and did not intend to fire the gun.

246.     The bullet struck Garth in the top of his right buttock and exited through his thigh causing substantial injury, maceration of tissue, and blood loss.

247.     Following the discharge of the P320, Garth missed six (6) weeks of work, and upon return, refused to use the P320 again.

248.     While the full extent of the physical damage to Garth's buttock and thigh is not yet known, he will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

249.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Garth was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Garth has in the past and is reasonably likely to require medicines, medical care and treatment.  Garth has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Garth has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. The incident has resulted in substantial physical harm and related trauma to Garth, who has received substantial and ongoing treatments and medicines.

**Joseph Halase**

250.     Prior to July 27, 2020, Halase had undergone extensive firearms training while serving in the United States Marine Corps and United States Immigration and Customs Enforcement Agency.

251.     Prior to July 27, 2020, Halase was issued a P320 by ICE.

252.     On July 27, 2020, Halase removed his P320 from his holster.

253.     On that date, Halase's pistol suddenly and unexpectedly discharged while he was re-holstering it.

254.     Halase never touched the P320's trigger and did not intend to fire the gun.

255.     The bullet struck Halase in his right leg, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

256.     While the full extent of the physical damage to Halase's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

257.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Halase was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Halase has in the past and is reasonably likely to require medicines, medical care and treatment.  Halase has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Halase has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Halase has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Halase's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Halase, who has received substantial and ongoing treatments and medicines.

**Amy Hendel**

258.     Prior to May 12, 2021, Hendel had undergone extensive firearms training while serving in the United States Department of Homeland Security.

259.    Prior to May 12, 2021, Hendel was issued a P320 by ICE.

260.    On May 12, 2021, Hendel was using a P320 during qualification exercises.

261.    On that date, Hendel's pistol suddenly and unexpectedly discharged while in its holster.

262.    Hendel never touched the P320's trigger and did not intend to fire the gun.

263.    The shell casing did not eject from Hendel's weapon.

264.    The bullet struck Hendel in her upper right thigh, travelled through her thigh, exited her thigh, reentered through her calf, travelled through her calf, and exited her shin, causing substantial injury, including a shattered tibia, hip damage, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

265.    While the full extent of the physical damage to Hendel's leg is not yet known, she has had and it is likely that she will have trouble running, sitting, or standing as she had before the incident, and will likely never be able to return to her pre-incident form as a result of diminished physical capacity.

266.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Hendel was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Hendel has in the past and is reasonably likely to require medicines, medical care and treatment.  Hendel has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Hendel has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Hendel has in the past and may in the future continue to be disabled from performing her usual duties, occupations, and avocations, all to Hendel's great loss and detriment.

The incident has resulted in substantial physical harm and related trauma to Hendel, who has received substantial and ongoing treatments and medicines.

**Nathan Henyan**

267.    Prior to April 15, 2020, Henyan had undergone extensive firearms training while serving in the United States Marines and the Yakima Police Department.

268.    Prior to April 15, 2020, Henyan purchased a P320 for use as a Yakima Police Officer.

269.    The P320 was authorized by the Yakima Police Department for use by officers.

270.    On April 15, 2020, Henyan had his P320 in a holster on his left ribcage.

271.    While reaching across his chest for the P320 and placing his hand on the grip, the pistol suddenly and unexpectedly discharged.

272.    Henyan never touched the P320's trigger and did not intend to fire the gun.

273.    The bullet struck Henyan in his left hip, travelled through his left leg, and exited at his hamstring, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

274.    While the full extent of the physical damage to Henyan's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

275.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Henyan was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Henyan has in the past and is reasonably likely to require medicines, medical

care and treatment.  Henyan has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Henyan has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Henyan has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Henyan's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Henyan, who has received substantial and ongoing treatments and medicines.

**Dwight Jackson**

276.     Prior to May 25, 2022, Jackson had undergone extensive firearms training while serving as a Georgia State correctional officer, a police officer in Bladensburg, Maryland, and a police officer in Monticello, Georgia.

277.     Prior to May 25, 2022, Jackson purchased a P320 for personal use.

278.     On May 25, 2022, with the P320 in a holster, and the holster secured to his belt, Jackson leaned over to pick something up, then leaned up.

279.     On that date, Jackson's P320 suddenly and unexpectedly discharged.

280.     Jackson's hands were not on the gun or the holster at the time the gun went off.

281.     Jackson never touched the P320's trigger and did not intend to fire the gun.

282.     The bullet struck Jackson in his right hip, out of his buttocks, and back into his left ankle, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

283.     While the full extent of the physical damage to Jackson's hip, buttocks, and ankle is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing

as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

284.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Jackson was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Jackson has in the past and is reasonably likely to require medicines, medical care and treatment.  Jackson has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Jackson has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Jackson has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Jackson's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Jackson, who has received substantial treatments and medicines.

**Adam Maritato and Robert Parks**

285.     Prior to July 14, 2020, Maritato and Parks had undergone extensive firearms training while serving as police officers.

286.     Prior to July 14, 2020, Maritato and Parks were issued P320s by the Milwaukee Police Department.

287.     On July 14, 2020, Maritato and Parks were working as partners in the Milwaukee Police Department.

288.     On that date, Maritato and Parks had their P320s in their holsters while they were in the process of detaining an uncooperative suspect.

289.     Parks's fully holstered P320 discharged from within its holster while both of Parks's hands were on the suspect.

290.     The bullet struck Maritato in his right leg, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

291.     While the full extent of the physical damage to Maritato's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

292.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Maritato was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Maritato has in the past and is reasonably likely to require medicines, medical care and treatment.  Maritato has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Maritato has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Maritato has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Maritato's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Maritato, who has received substantial and ongoing treatments and medicines.

293.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Parks was forced to suffer serious, disabling, and permanent emotional distress, the full extent of which has yet to be determined.  Parks has in the past and is reasonably likely to require medicines, medical care and

treatment.  Parks has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Parks has in the past and may in the future continue to suffer psychological and emotional anguish.  Parks has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Parks's great loss and detriment.

**Michael Parker**

294.    Prior to November 2, 2021, Parker had undergone extensive firearms training as a gun owner.

295.    Prior to November 2, 2021, Parker purchased a P320 for personal use.

296.    On November 2, 2021, Parker was removing his holstered P320 from his pocket.

297.    On that date, Parker's P320 suddenly and unexpectedly discharged.

298.    Parker never touched the P320's trigger and did not intend to fire the gun.

299.    The bullet struck Parker in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

300.    While the full extent of the physical damage to Parker's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

301.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Parker was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Parker has in the past and is reasonably likely to require medicines, medical care and treatment.  Parker has in the past and may in the future continue to be compelled to expend

monies and incur further obligations for such medical care and treatment. Parker has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Parker has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Parker's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Parker, who has received substantial and ongoing treatments and medicines.

**James Scoppa**

302.    Prior to November 29, 2021, James Scoppa had undergone extensive firearms training while serving as a detective in the Atlantic County County Prosecutor's Office.

303.    Prior to November 29, 2021, Scoppa was issued a P320 by the Atlantic County Prosecutor's Office.

304.    On November 29, 2021, Scoppa placed his holstered P320 in the center console of his vehicle.

305.    On that date, Scoppa's P320 suddenly and unexpectedly discharged from within its holster.

306.    Scoppa never touched the P320's trigger and did not intend to fire the gun.

307.    The bullet struck the inside of Scoppa's vehicle and caused Scoppa to sustain persistent tinnitus along with severe emotional trauma.

308.    While the full extent of the physical damage to Scoppa is not yet known, he has had and it is likely that he will have trouble hearing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

309.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Scoppa was forced to suffer

45

serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Scoppa has in the past and is reasonably likely to require medicines, medical care and treatment.  Scoppa has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Scoppa has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Scoppa has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Scoppa's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Scoppa, who has received substantial and ongoing treatments and medicines.

**Jerry Wyche**

310.    Prior to November 9, 2020, Jerry Wyche had undergone extensive firearms training while serving in the Tampa Police Department.

311.    Prior to November 9, 2020, Wyche was issued a P320 by the Tampa Police Department.

312.    On November 9, 2020, Wyche was sitting in a parked police car with the P320 in his holster.

313.    On that date, as Wyche tried to get up out of the parked car, Wyche's P320 suddenly and unexpectedly discharged from within its holster.

314.    Wyche's hands were on the steering wheel, he never touched the P320's trigger and did not intend to fire the gun.

315.    As a result of the unexpected discharge of the P320, a piece of Wyche's holster was broken, which led to severe lacerations to Wyche's thigh.

316.     While the full extent of the physical damage and emotional damage to Wyche is not yet known, he has had, and it is likely that he will have permanent scarring and is suffering from severe emotional issues.

317.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Wyche was forced to suffer serious, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Wyche has in the past and is reasonably likely to require medicines, medical care and treatment.  Wyche has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Wyche has in the past and may in the future continue to suffer psychological and emotional anguish.  Wyche has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Wyche's great loss and detriment. The incident has resulted in substantial emotional harm and related trauma to Wyche.

## COUNT I – NEGLIGENCE
### FERNANDO ARMENDARIZ V. SIG SAUER

318.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

319.     At all relevant times, Sig Sauer owed Armendariz the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

320.     At all relevant times, Sig Sauer owed Armendariz the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

321.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Armendariz, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

322.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Aremedariz, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.     By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.     By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.     Other negligent acts and omissions to be developed in the course of discovery.

323.     Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

324.     The gun's defective condition was not visible and Armendariz was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

325.     Sig Sauer's negligence, as alleged in this Count, directly and proximately Armendariz the April 1, 2021 unintended discharge and Armendariz's injuries resulting from the accident.

326.     As a direct and proximate result of the negligence set forth in this Count, Armendariz suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Armendariz will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II - STRICT PRODUCT LIABILITY
## FERNANDO ARMENDARIZ V. SIG SAUER

327.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

328.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

329.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

330.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

331.    The defective condition of the P320 caused Plaintiff's injuries.

332.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### FERNANDO ARMENDARIZ V. SIG SAUER

333.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

334.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

335.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Armendariz, entitled Armendariz to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV – NEGLIGENCE
## MATTHEW BREEDON V. SIG SAUER

336.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

337.    At all relevant times, Sig Sauer owed Breedon the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

338.    At all relevant times, Sig Sauer owed Breedon the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

339.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Breedon, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

340.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Breedon, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

341.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

342.    The gun's defective condition was not visible and Breedon was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

343.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the April 4, 2022 unintended discharge and Breedon's injuries resulting from the accident.

344.    As a direct and proximate result of the negligence set forth in this Count, Breedon suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Breedon will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V - STRICT PRODUCT LIABILITY
### MATTHEW BREEDON V. SIG SAUER

345.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

346.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

347.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

348.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

349.    The defective condition of the P320 caused Plaintiff's injuries.

350.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VI – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### MATTHEW BREEDON V. SIG SAUER

351.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

352.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

353.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Breedon, entitled Breedon to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VII - NEGLIGENCE
### ZACHARY BROWN V. SIG SAUER

354.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

355.     At all relevant times, Sig Sauer owed Brown the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

356.     At all relevant times, Sig Sauer owed Brown the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

357.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Brown, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

358.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Brown, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery;

359.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

360.    The gun's defective condition was not visible and Brown was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

361.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 15, 2022, unintended discharge and Brown's injuries resulting from the accident.

362.     As a direct and proximate result of the negligence set forth in this Count, Brown suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Brown will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VIII - STRICT PRODUCT LIABILITY
### ZACHARY BROWN V. SIG SAUER

363.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

364.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

365.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

366.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

367.    The defective condition of the P320 caused Plaintiff's injuries.

368.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IX – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### ZACHARY BROWN V. SIG SAUER

369.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

370.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

371.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Brown entitled Brown to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT X – NEGLIGENCE
## CATHERINE CHARGUALAF V. SIG SAUER

372.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

373.    At all relevant times, Sig Sauer owed Chargualaf the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

374.    At all relevant times, Sig Sauer owed Chargualaf the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

375.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Chargualaf, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

376.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

      ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Chargualaf, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

377.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

378.    The gun's defective condition was not visible and Chargualaf was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

379.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the December 8, 2020 unintended discharge and Chargualaf's injuries resulting from the accident.

380.    As a direct and proximate result of the negligence set forth in this Count, Chargualaf suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for her care and treatment. These injuries are either permanent or continuing in their nature and Chargualaf will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XI - STRICT PRODUCT LIABILITY
## CATHERINE CHARGUALAF V. SIG SAUER

381.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

382.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

      a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

      b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

      c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

      d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

383.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

384.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

385.    The defective condition of the P320 caused Plaintiff's injuries.

386.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### CATHERINE CHARGUALAF V. SIG SAUER

387. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

388. By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

389. Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Chargualaf, entitled Chargualaf to mandatory doubling and discretionary trebling of her actual damages, as well as her reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIII – NEGLIGENCE
### WILLIAM CLEGG V. SIG SAUER

390. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

391. At all relevant times, Sig Sauer owed Clegg the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

392. At all relevant times, Sig Sauer owed Clegg the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

393.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Clegg, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

394.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.     By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Clegg, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

395.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

396.    The gun's defective condition was not visible and Clegg was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

397.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 7, 2022 unintended discharge and Clegg injuries resulting from the accident.

398.     As a direct and proximate result of the negligence set forth in this Count, Clegg suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Clegg will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIV - STRICT PRODUCT LIABILITY
### WILLIAM CLEGG V. SIG SAUER

399.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

400.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

e.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

f.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

g.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

h.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

401.     The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

402.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

403.     The defective condition of the P320 caused Plaintiff's injuries.

404.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XV – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### WILLIAM CLEGG V. SIG SAUER

405.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

406.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

407.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Clegg, entitled Clegg to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XVI – NEGLIGENCE
### DIONICIO DELGADO V. SIG SAUER

408. At all relevant times, Sig Sauer owed Delgado the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

409. At all relevant times, Sig Sauer owed Delgado the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

410. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Delgado, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

411. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

  i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

  ii. By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

  iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Delgado, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber.

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors.

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

71

412. Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

413. The gun's defective condition was not visible and Delgado was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

414. Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 12, 2022 unintended discharge and Delgado's injuries resulting from the accident.

415. As a direct and proximate result of the negligence set forth in this Count, Delgado suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Delgado will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XVII - STRICT PRODUCT LIABILITY
### DIONICIO DELGADO V. SIG SAUER

416. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

417. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

418.   The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

419.   Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

420.   The defective condition of the P320 caused Plaintiff's injuries.

421.   Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XVIII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### DIONICIO DELGADO V. SIG SAUER

422.   Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

423.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

424.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Delgado, entitled Delgado to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XIX – NEGLIGENCE
**MARY DOFFENY V. SIG SAUER**

425.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

426.     At all relevant times, Sig Sauer owed Doffeny the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

427.     At all relevant times, Sig Sauer owed Doffeny the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

428.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Doffeny, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and

formal claims arising from substantially similar incidents, internal testing and research, industry

publications and research, and other sources of information to be developed in discovery.

429.    Sig Sauer breached the above-cited duties in various ways, including but not limited

to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Doffeny, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the

user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

430.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

431.    The gun's defective condition was not visible and Doffeny was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

432.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the December 5, 2021 unintended discharge and Doffeny's injuries resulting from the accident.

433.    As a direct and proximate result of the negligence set forth in this Count, Doffeny suffered mental anguish, inconvenience, loss of the capacity for the enjoyment of life, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for her care and treatment.  These emotional injuries are either permanent or continuing in their nature and Doffeny will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XX - STRICT PRODUCT LIABILITY
### MARY DOFFENY V. SIG SAUER

434.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

435.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

436.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

437.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

438.    The defective condition of the P320 caused Plaintiff's injuries.

439.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXI – VIOLATION OF NEW HAMPSHIRE
### CONSUMER PROTECTION ACT
### MARY DOFFENY V. SIG SAUER

440.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

441.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

442.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Doffeny, entitled Doffeny to mandatory doubling and discretionary trebling of her actual damages, as well as her reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXII – NEGLIGENCE
### DAVID DUFF V. SIG SAUER

443.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

444.    At all relevant times, Sig Sauer owed Duff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

445.    At all relevant times, Sig Sauer owed Duff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

446.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Duff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

447.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Duff, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

448.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

449.    The gun's defective condition was not visible and Duran was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

450.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 15, 2020 unintended discharge and Duff's injuries resulting from the accident.

451.    As a direct and proximate result of the negligence set forth in this Count, Duff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Duff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXIII - STRICT PRODUCT LIABILITY
### DAVID DUFF V. SIG SAUER

452.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

453.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

454. The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

455. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

456. The defective condition of the P320 caused Plaintiff's injuries.

457. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXIV – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### DAVID DUFF V. SIG SAUER

458. Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

459. By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

460.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Duff, entitled Duff to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XXV – NEGLIGENCE
### JUAN DURAN V. SIG SAUER

461.     Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

462.     At all relevant times, Sig Sauer owed Duran the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

463.     At all relevant times, Sig Sauer owed Duran the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

464.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Duran, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

465.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.  By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.  By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.  By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.  By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.  By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.  By negligently failing to unambiguously warn purchasers and end users of the gun, including Duran, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.  By including a defective and improper holster in the original packaging with the gun;

x.  By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

466.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

467.    The gun's defective condition was not visible and Duran was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

468.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the February 26, 2022 unintended discharge and Duran's injuries resulting from the accident.

469.    As a direct and proximate result of the negligence set forth in this Count, Duran suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Duran will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXVI - STRICT PRODUCT LIABILITY
### JUAN DURAN V. SIG SAUER

470. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

471. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   e. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   f. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   g. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   h. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

472. The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

473. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

474. The defective condition of the P320 caused Plaintiff's injuries.

475. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXVII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### JUAN DURAN V. SIG SAUER

476.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

477.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

478.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Duran, entitled Duran to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXVIII – NEGLIGENCE
### KYLA ELLIS V. SIG SAUER

479.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

480.    At all relevant times, Sig Sauer owed Ellis the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

481.    At all relevant times, Sig Sauer owed Ellis the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to

prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

482.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Ellis, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

483.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Ellis, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.      By including a defective and improper holster in the original packaging with the gun;

x.       By misrepresenting the dangers and hazards posed by the gun;

xi.      By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.     Other negligent acts and omissions to be developed in the course of discovery.

484.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

485.    The gun's defective condition was not visible and Ellis was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

486.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the June 15, 2021 unintended discharge and Ellis' injuries resulting from the accident.

487.    As a direct and proximate result of the negligence set forth in this Count, Ellis suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for her care and treatment.  These injuries are either permanent or continuing in their nature and Ellis will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXIX - STRICT PRODUCT LIABILITY
### KYLA ELLIS V. SIG SAUER

488.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

489.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

490.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

491.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

492.    The defective condition of the P320 caused Plaintiff's injuries.

493.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXX – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### KYLA ELLIS V. SIG SAUER

494.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

495.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

496.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Ellis entitled Ellis to mandatory doubling and discretionary trebling of her actual damages, as well as her reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXI – NEGLIGENCE
### JAMES GARTH JR. V. SIG SAUER

497.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

498.    At all relevant times, Sig Sauer owed Garth the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

499.    At all relevant times, Sig Sauer owed Garth the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

500.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Garth, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

501.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

   i.  By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.   By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.   By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Garth, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.   By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

502.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

503.  The gun's defective condition was not visible and Garth was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

504.  Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the August 18, 2021 unintended discharge and Garth's injuries resulting from the accident.

505.  As a direct and proximate result of the negligence set forth in this Count, Garth suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Garth will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXII - STRICT PRODUCT LIABILITY
### JAMES GARTH JR. V. SIG SAUER

506.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

507.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   i.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   j.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   k.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   l.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

508.     The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

509.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

510.     The defective condition of the P320 caused Plaintiff's injuries.

511.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXIII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### JAMES GARTH JR. V. SIG SAUER

512.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

513.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

514.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Garth, entitled Garth to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXIV – NEGLIGENCE
### JOSEPH HALASE V. SIG SAUER

515.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

516.    At all relevant times, Sig Sauer owed Halase the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

517.    At all relevant times, Sig Sauer owed Halase the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to

prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

518.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Halase, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

519.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;
>
> ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;
>
> iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;
>
> iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;
>
> v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;
>
> vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Halase, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

520.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

521.    The gun's defective condition was not visible and Halase was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

522.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the July 27, 2020 unintended discharge and Halase's injuries resulting from the accident.

523.    As a direct and proximate result of the negligence set forth in this Count, Halase suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Halase will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXV - STRICT PRODUCT LIABILITY
### JOSEPH HALASE V. SIG SAUER

524.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

525.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

99

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

526.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

527.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

528.    The defective condition of the P320 caused Plaintiff's injuries.

529.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVI – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### JOSEPH HALASE V. SIG SAUER

530.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

531.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

532.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Halase entitled Halase to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVII – NEGLIGENCE
### AMY HENDEL V. SIG SAUER

533.  Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

534.  At all relevant times, Sig Sauer owed Hendel the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

535.  At all relevant times, Sig Sauer owed Hendel the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

536.  At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Hendel, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

537.  Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Hendel, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.     By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

538.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

539.    The gun's defective condition was not visible and Hendel was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

540.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the May 12, 2021 unintended discharge and Hendel's injuries resulting from the accident.

541.    As a direct and proximate result of the negligence set forth in this Count, Hendel suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for her care and treatment.  These injuries are either permanent or continuing in their nature and Hendel will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVIII - STRICT PRODUCT LIABILITY
### AMY HENDEL V. SIG SAUER

542.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

543.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

544.     The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

545.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

546.     The defective condition of the P320 caused Plaintiff's injuries.

547.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XXXIX- VIOLATION OF NEW HAMPSHIRE
### CONSUMER PROTECTION ACT
### AMY HENDEL V. SIG SAUER

548.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

549.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

550.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Hendel entitled Hendel to mandatory doubling and discretionary trebling of her actual damages, as well as her reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XL – NEGLIGENCE
### NATHAN HENYAN V. SIG SAUER

551.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

552.    At all relevant times, Sig Sauer owed Henyan the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

553.    At all relevant times, Sig Sauer owed Henyan the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to

prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

554.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Henyan, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

555.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Henyan, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

556.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

557.    The gun's defective condition was not visible and Henyan was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

558.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the April 15, 2020 unintended discharge and Henyan's injuries resulting from the accident.

559.    As a direct and proximate result of the negligence set forth in this Count, Henyan suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Henyan will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLI - STRICT PRODUCT LIABILITY
### NATHAN HENYAN V. SIG SAUER

560.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

561.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

562.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

563.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

564.    The defective condition of the P320 caused Plaintiff's injuries.

565.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLII - VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### NATHAN HENYAN V. SIG SAUER

566.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

567.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

568.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Henyan entitled Henyan to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT XLIII– NEGLIGENCE
### DWIGHT JACKSON V. SIG SAUER

569.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

570.     At all relevant times, Sig Sauer owed Jackson the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

571.     At all relevant times, Sig Sauer owed Jackson the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

572.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Jackson, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

573.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

     i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

     ii.     By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Jackson, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

574.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

575.   The gun's defective condition was not visible and Jackson was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

576.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the May 25, 2022 unintended discharge and Jackson injuries resulting from the accident.

577.   As a direct and proximate result of the negligence set forth in this Count, Jackson suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Jackson will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIV - STRICT PRODUCT LIABILITY
### DWIGHT JACKSON V. SIG SAUER

578.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

579. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

      m. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

      n. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

      o. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

      p. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

580. The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

581. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

582. The defective condition of the P320 caused Plaintiff's injuries.

583. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLV – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### DWIGHT JACKSON V. SIG SAUER

584.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

585.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

586.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Jackson, entitled Jackson to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVI – NEGLIGENCE
### ADAM MARITATO V. SIG SAUER

587.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

588.     At all relevant times, Sig Sauer owed Maritato the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

589.     At all relevant times, Sig Sauer owed Maritato the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

590.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Maritato, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

591.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Maritato, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix. By including a defective and improper holster in the original packaging with the gun;

xi. By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv. Other negligent acts and omissions to be developed in the course of discovery.

592. Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

593. The gun's defective condition was not visible and Maritato was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

594. Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the July 14, 2020 unintended discharge and Maritato's injuries resulting from the accident.

595. As a direct and proximate result of the negligence set forth in this Count, Maritato suffered severe injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses

for his care and treatment. These injuries are either permanent or continuing in their nature and Maritato will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVII - STRICT PRODUCT LIABILITY
### ADAM MARITATO V. SIG SAUER

596. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

597. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

598. The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

599.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

600.    The defective condition of the P320 caused Plaintiff's injuries.

601.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVIII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### ADAM MARITATO V. SIG SAUER

602.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

603.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

604.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Maritato entitled Maritato to mandatory doubling and discretionary trebling of his actual damages, as well as her reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIX – NEGLIGENCE
### MICHAEL PARKER V. SIG SAUER

605.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

606. At all relevant times, Sig Sauer owed Parker the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

607. At all relevant times, Sig Sauer owed Parker the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

608. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Parker, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

609. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii. By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv. By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Parker, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

610.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

611.    The gun's defective condition was not visible and Parker was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

612.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 2, 2021 unintended discharge and Parker's injuries resulting from the accident.

613.    As a direct and proximate result of the negligence set forth in this Count, Parker suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Delgado will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT L - STRICT PRODUCT LIABILITY
### MICHAEL PARKER V. SIG SAUER

614.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

615.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

121

a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

616. The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

617. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

618. The defective condition of the P320 caused Plaintiff's injuries.

619. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT LI– VIOLATION OF THE NEW HAMPSHIRE**</u>
<u>**CONSUMER PROTECTION ACT**</u>
**MICHAEL PARKER V. SIG SAUER**

620. Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

621.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

622.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Parker entitled Parker to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LII – NEGLIGENCE
### ROBERT PARKS V. SIG SAUER

623.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

624.    At all relevant times, Sig Sauer owed Parks the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

625.    At all relevant times, Sig Sauer owed Parks the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

626.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Parks, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and

formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

627. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii. By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv. By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi. By negligently failing to unambiguously warn purchasers and end users of the gun, including Parks, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the

user manual for the gun after several incidents of un-commanded discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.   By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

628.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

629.   The gun's defective condition was not visible and Parks was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

630.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the July 14, 2020 unintended discharge and Parks's emotional injuries resulting from the accident.

631.   As a direct and proximate result of the negligence set forth in this Count, Parks suffered severe mental anguish, inconvenience, loss of the capacity for the enjoyment of life, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Parks will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LIII - STRICT PRODUCT LIABILITY
### ROBERT PARKS V. SIG SAUER

632.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

633.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

634.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

635.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

636.    The defective condition of the P320 caused Plaintiff's injuries.

637.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LIV – VIOLATION OF NEW HAMPSHIRE
### CONSUMER PROTECTION ACT
### ROBERT PARKS V. SIG SAUER

638.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

639.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

640.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Parks entitled Parks to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LV – NEGLIGENCE
### JAMES SCOPPA V. SIG SAUER

641.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

642.    At all relevant times, Sig Sauer owed Scoppa the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

643.     At all relevant times, Sig Sauer owed Scoppa the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

644.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Scoppa, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

645.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

     i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

     ii.      By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

     iii.      By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

     iv.      By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

     v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Scoppa, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

646.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

647.    The gun's defective condition was not visible and Scoppa was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

648.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 29, 2021 unintended discharge and Scoppa's injuries resulting from the accident.

649.    As a direct and proximate result of the negligence set forth in this Count, Scoppa suffered auditory injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Scoppa will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT LVI- STRICT PRODUCT LIABILITY**
**JAMES SCOPPA V. SIG SAUER**

650.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

651.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

652.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

653.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

654.    The defective condition of the P320 caused Plaintiff's injuries.

655.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LVII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### JAMES SCOPPA V. SIG SAUER

656.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

657.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

658.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Scoppa entitled Scoppa to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVIII – NEGLIGENCE
### JERRY WYCHE V. SIG SAUER

659.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

660.     At all relevant times, Sig Sauer owed Wyche the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

661.     At all relevant times, Sig Sauer owed Wyche the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

662.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Wyche, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

663.     Sig Sauer breached the above-cited duties in various ways, including but not limited

to, one or more of the following negligent acts:

     i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

     ii.     By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

     iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

     iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

     v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

     vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Wyche, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

     vii.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

     viii.     By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

     ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s competitors;

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

664.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

665.    The gun's defective condition was not visible and Wyche was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

666.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 9, 2020 unintended discharge and Wyche injuries resulting from the accident.

667.    As a direct and proximate result of the negligence set forth in this Count, Wyche suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Wyche will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in their favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LIX - STRICT PRODUCT LIABILITY
### JERRY WYCHE V. SIG SAUER

668.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

669.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

q.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

r.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

s.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

t.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

670.    The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

671.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

672. The defective condition of the P320 caused Plaintiff's injuries.

673. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LX – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### JERRY WYCHE V. SIG SAUER

674. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

675. By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

676. Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Wyche, entitled Wyche to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXI – LOSS OF CONSORTIUM
### MIRIAM TREBINO V. SIG SAUER

677. Plaintiff incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

678. At all relevant times hereto, Plaintiff, Trebino, was the lawfully wedded wife of husband-plaintiff, Francisco Armendariz, with whom she lives.

679.     As a result of the injuries sustained by Mr. Amrendariz, wife-plaintiff Trebino has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>COUNT LXII – LOSS OF CONSORTIUM</u>
**LINDSEY BROOKE MIXON V. SIG SAUER**

680.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

681.     At all relevant times hereto, Plaintiff, Mixon, was the lawfully wedded wife of husband-plaintiff, Matthew Breedon, with whom she lives.

682.     As a result of the injuries sustained by Mr. Breedon, wife-plaintiff Mixon has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Mixon, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>COUNT LXIII – LOSS OF CONSORTIUM</u>
**JUAN SAN NICOLAS CHARGUALAF V. SIG SAUER**

683.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

684.     At all relevant times hereto, Plaintiff, Juan San Nicolas Chargualaf, was the lawfully wedded husband of Catherine Chargualaf, with whom he lives.

685.     As a result of the injuries sustained by Mrs. Chargualaf , husband-plaintiff Juan San

Nicolas Chargualaf, has been and will continue to be deprived of the love, assistance,

companionship, consortium and society of his wife, all to his great loss and detriment.

**WHEREFORE**, Plaintiff, Juan San Nicolas Chargualaf, demands judgment in his favor and

against Defendant for compensatory and enhanced compensatory damages, together with lawful

interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT LXIX – LOSS OF CONSORTIUM**
**JADA BRAY V. SIG SAUER**

686.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the

same as if fully set forth hereinafter.

687.     At all relevant times hereto, Plaintiff, Jada Bray, was the lawfully wedded wife of

William Clegg, with whom she lives.

688.     As a result of the injuries sustained by Mr. Clegg, wife-plaintiff Jada Bray, has been

and will continue to be deprived of the love, assistance, companionship, consortium and society

of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Jada Bray, demands judgment in her favor and against Defendant for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

**COUNT LXX – LOSS OF CONSORTIUM**
**DIANA DELGADO V. SIG SAUER**

689.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the

same as if fully set forth hereinafter.

690.     At all relevant times hereto, Plaintiff, Diana Delgado, was the lawfully wedded wife

of husband-plaintiff, Dionicio Delgado, with whom she lives.

691.    As a result of the injuries sustained by Mr. Delgado, wife-plaintiff Diana Delgado, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Diana Delgado, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXI– LOSS OF CONSORTIUM
### JOSEPH DOFFENY V. SIG SAUER

692.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

693.    At all relevant times hereto, Plaintiff, Joseph Doffeny, was the lawfully wedded husband of wife-plaintiff, Doffeny, with whom he lives.

694.    As a result of the injuries sustained by Mrs. Doffeny, husband-plaintiff Joseph Doffeny, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of his wife, all to his great loss and detriment.

**WHEREFORE**, Plaintiff, Joseph Doffeny, demands judgment in his favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXII – LOSS OF CONSORTIUM
### CLAYTON ELLIS V. SIG SAUER

695.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

696.    At all relevant times hereto, Plaintiff, Clayton Ellis, was the lawfully wedded husband of wife-plaintiff, Kyla Ellis, with whom he lives.

697.    As a result of the injuries sustained by Mrs. Ellis, husband-plaintiff Clayton Ellis, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of his wife, all to his great loss and detriment.

**WHEREFORE**, Plaintiff, Clayton Ellis, demands judgment in his favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LXXIII – LOSS OF CONSORTIUM
### LYNN MARIE HALASE V. SIG SAUER

698.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

699.    At all relevant times hereto, Plaintiff, Lynn Marie Halase, was the lawfully wedded wife of husband-plaintiff, Joseph Halase, with whom she lives.

700.    As a result of the injuries sustained by Mr. Halase, wife-plaintiff Lynn Marie Halase, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Lynn Marie Halase, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LXXIV – LOSS OF CONSORTIUM
### AMBER HENYAN V. SIG SAUER

701.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

702.    At all relevant times hereto, Plaintiff, Amber Henyan, was the lawfully wedded wife of husband-plaintiff, Nathan Henyan, with whom she lives.

703.    As a result of the injuries sustained by Mr. Henyan, wife-plaintiff Amber Henyan has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Amber Henyan, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXV – LOSS OF CONSORTIUM
### MICHAELA-KELLY JACKSON V. SIG SAUER

704.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

705.    At all relevant times hereto, Plaintiff, Michaela-Kelly Jackson, was the lawfully wedded husband of Dwight Jackson, with whom she lives.

706.    As a result of the injuries sustained by Mr. Jackson, wife-plaintiff Michaela-Kelly Jackson, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Michaela-Kelly Jackson, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXXVI – LOSS OF CONSORTIUM
### LAURA LYNN MARITATO V. SIG SAUER

707.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

708.    At all relevant times hereto, Plaintiff, Laura Lynn Maritato, was the lawfully wedded wife of husband-plaintiff, Adam Maritato, with whom she lives.

709.     As a result of the injuries sustained by Mr. Maritato, wife-plaintiff Laura Lynn Maritato has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, Maritato all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Laura Lynn Maritato, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LXXVII – LOSS OF CONSORTIUM
### MICHELLE PARKS V. SIG SAUER

710.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

711.     At all relevant times hereto, Plaintiff, Michelle Parks was the lawfully wedded wife of husband-plaintiff, Robert Parks, with whom she lives.

712.     As a result of the injuries sustained by Mr. Parks, wife-plaintiff Michelle Parks, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Michelle Parks, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LXXVIII– LOSS OF CONSORTIUM
### LEAH MICHELLE SCOPPA V. SIG SAUER

713.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

714.     At all relevant times hereto, Plaintiff, Leah Michelle Scoppa was the lawfully wedded wife of husband-plaintiff, James Scoppa, with whom she lives.

715.    As a result of the injuries sustained by Mr. Scoppa, wife-plaintiff Leah Michelle Scoppa, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, Leah Michelle Scoppa, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

FERNANDO ARMENDARIZ, et al.,

By their attorneys,

**SALTZ MONGELUZZI & BENDESKY P.C.**

Date:  March 13, 2023        By:      */s/ Robert Mongeluzzi*
                                        ROBERT MONGELUZZI, PA Bar #36283
                                        LARRY BENDESKY, PA Bar # 51026
                                        ROBERT W. ZIMMERMAN, PA Bar #208410
                                        DANIEL L. CEISLER, PA Bar #326798
                                        RYAN D. HURD, PA Bar #205955
                                        *Pro Hac Vice Applications Filed*
                                        One Liberty Place, 52nd Floor
                                        1650 Market Street
                                        Philadelphia, PA 19103
                                        (215) 496-8282
                                        rmongeluzzi@smbb.com
                                        lbendesky@smbb.com
                                        rzimmerman@smbb.com
                                        dceisler@smbb.com
                                        rhurd@smbb.com

                              and

                              **DOUGLAS, LEONARD & GARVEY, P.C.**

Date:  March 13, 2023        By:      */s/ Benjamin T King*
                                        BENJAMIN T. KING, NH Bar #12888
                                        14 South Street, Suite 5
                                        Concord, NH 03301
                                        (603) 224-1988
                                        benjamin@nhlawoffice.com

143